275 N.J. Super. 109 (1994)
645 A.2d 802
ALEXANDER RITONDO, AN INFANT, BY HIS PARENTS AND GUARDIAN AD LITEM MARY ANN RITONDO AND VINCENT RITONDO, AND MARY ANN RITONDO AND VINCENT RITONDO INDIVIDUALLY AND IN THEIR OWN RIGHT, PLAINTIFFS-APPELLANTS,
v.
BERNARD A. PEKALA, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1994.
Decided July 26, 1994.
*110 Before Judges HAVEY, ARNOLD M. STEIN and ARIEL A. RODRIGUEZ.
*111 Ian Stuart, argued the cause for appellant (Mr. Stuart, attorney, on the brief).
Robert E. Paarz, argued the cause for respondent (Paarz, Master & Koernig, attorneys; Mr. Paarz, on the brief).
ARIEL A. RODRIGUEZ, J.S.C. (temporarily assigned).
We affirm the judgment of involuntary dismissal at the end of the plaintiffs' case. We hold that the testimony of an expert witness on direct examination regarding the standard of care in a medical malpractice case is nullified when on cross-examination the witness clearly and unequivocally abandons it.
When Mary Ann Ritondo became pregnant with her third child, she came under the care of Bernard Pekala, M.D., a specialist in obstetrics and gynecology. She informed Dr. Pekala that she had been diagnosed with Class B (insulin dependent) diabetes. Because he considered her pregnancy to be high risk, he directed her to visit Garden State Hospital regularly for antenatal testing. She followed his instruction and for thirty-six weeks of gestation showed no signs of complications.
However, while Mrs. Ritondo was undergoing one of her last antenatal tests, the nurse noticed an abnormality in the fetal heartbeat. The nurse promptly notified Dr. Pekala, who directed the patient to check immediately into Cooper Hospital where he would induce delivery.
Dr. Pekala induced labor. Despite encountering complications and the presence of meconium staining, he allowed Mrs. Ritondo to deliver vaginally.[1] At birth, baby Alexander appeared purple and unhealthy. One hour after birth, he was inactive and unresponsive. He remained in the intensive care unit for thirty days. Alexander underwent surgery to have a fluid-draining shunt placed in his head, which remains there today.
*112 Alexander's parents observed that he was not developing normally after he was released from the hospital. His physical and motor development was noticeably delayed. At age two, he was enrolled in a special education class, and is currently in the handicapped children's program at school. Alexander is now nine years old, seriously disabled and difficult to control.
The Ritondos filed a medical malpractice action against Dr. Pekala[2] and retained Saul Jeck, M.D., an OB/GYN, as their medical expert.
Dr. Jeck testified that Dr. Pekala deviated from medically accepted standard of care when: (1) he induced delivery without conducting tests to determine the maturity of the infant; (2) once delivery was induced he failed to recognize fetal distress and asphyxia; (3) he failed to perform an emergency cesarean section (C-section); and (4) he failed to consult a diabetes specialist prior to inducing delivery. His testimony tracked his written report.
On cross-examination he retreated entirely from his previous opinions. He readily and plainly admitted that, under the circumstances, it was a reasonable decision for Dr. Pekala not to perform a C-section but to allow Mrs. Ritondo to continue to labor. With this admission he effectively retracted deviations two and three as the following colloquy illustrates:
Q. So that, in this case, Dr. Jeck, you agree under the circumstances and the facts of this case that it was reasonable for Dr. Pekala to allow this lady to labor and not do a C-section, even though you would have done to the contrary?
[Objection. Overruled.]
A. Yes. If the monitor strips did not show any fetal distress for any period of time, and there were no decelerations, and there was good baseline variability, then I would agree that the doctor could continue with the labor without intervening.
Q. I'm talking about this fetal distress, this particular fetus, this fetal monitoring strip, these decelerations, this variability, this case.
A. Yes.
Q. Not if other things were true, but what's factually true according to your understanding of this record in this case.

*113 A. Yes.
Q. Would you agree that it was appropriate for Dr. Pekala to allow this patient to labor and to deliver vaginally rather than doing a C-section?
A. Yes.
During the cross-examination, the doctor attempted to clarify his statements by explaining that defendant still had deviated from the standard of care because of the presence of the additional dangers of meconium staining and the high risk nature of the pregnancy. He acknowledged that the fetal monitoring strip was normal and reassuring for the last seventy-two minutes of the delivery and that the baby probably appeared to be well at that time:
Q. Would that advocate in favor of waiting because of the risk associated with C-section, that improvement to the strip?
A. If there was, in fact, improvement to the strip, I could have no objection with waiting.
Q. Okay, so even if there was meconium staining earlier, if the strip improves, waiting is okay?
A. Correct.
Q. Okay. And that's what happened in this case, isn't it Doctor?
A. Yes.
Q. So that with respect to the second criticism and the facts of this case, even considering the meconium, it would be reasonable to wait, true?
A. True.
Q. So we can cross off number two and three?
A. Yeah.
With respect to Dr. Pekala's failure to test for fetal maturity before inducing labor (deviation number one), Dr. Jeck conceded that in this case there was no evidence of any lack of maturity of the fetus. He explained that anything less than thirty-seven weeks is considered technically premature, and recognized that because this child was taken to the regular nursery at birth he was probably not actually considered to have been born prematurely. Although he reiterated that the standard tests should have been performed, he conceded that even if these tests had been done, Dr. Pekala's decision to induce delivery may have been appropriate.
*114 Finally, Dr. Jeck reconsidered his opinion that Dr. Pekala should have consulted a diabetes specialist prior to inducing labor. He explained that the purpose of consultation is to insure that the blood sugar levels of the infant and the mother are stabilized. However, he acknowledged that since Alexander's blood sugar was normal at birth, consultation would have made no difference in this case.
Q. Okay. Now, although you say that the consultation with the specialist for diabetes should be done before the patient is induced, in this case, since we know that the baby was not hypoglycemic or low sugar at the time he was born, getting the specialist involved earlier would have made no difference in the outcome, true?
A. True.
Plaintiff's counsel quickly attempted to rehabilitate his witness on redirect:
Q. Doctor, taking into consideration this patient, with all of the things that you have described to us, and assume that she was a diabetic mother, that she was insulin dependent that during the course of the delivery process there was meconium staining at one time, and an hour and a half later, there was definite meconium staining, the fact that there was poor variability on the tapes, and that there was deceleration on the fetal monitoring tapes, taking all of those considerations into account, is it still your opinion that there was a deviation from the accepted standard of medical care as to items two and three on your report?
A. Yes, yes.
Q. And from looking at what resulted in this child and the injuries that you have described for us, and knowing and assuming as a fact that there was no emergent delivery necessary in this case, is it your opinion  if such a test had been done, and the child shown to be immature, do you have an opinion as to whether or not the C  the labor should have been forced?
A. If there was no evidence to indicate on that testing that there was any  that the baby was in distress, then there would be no indication to induce labor.
Q. Now the fact that this mother did not have  and I want you to assume as a fact that this mother did not have a diabetic consult prior to the time that she was given the medication to induce labor, and also to assume as fact that there was a nonemergent situation. Do you have an opinion within a reasonable degree of medical probability whether that was a deviation from the accepted standard of medical care?
A. Yes, I do.
Q. Is it so?
A. I would agree that it was, that it increased the risk to the mother of harm.
*115 Despite the reaffirmance of his original opinions on redirect, on re-cross Dr. Jeck once again abandoned his allegations of negligence against Dr. Pekala:
Q. And the last thing is on points two and three, do you recall  and if you don't we can probably have it read back, but do you recall saying to me that under the circumstances of this case, considering everything, considering the meconium, considering the decelerations, considering the diabetes, considering everything to do with this case, that you would delete this criticism? Do you remember saying that?
A. I remember saying that, yeah.
Q. And that's still your opinion as of this moment, correct?
A. Yes.
At the close of Dr. Jeck's testimony, the judge dismissed the complaint pursuant to R. 4:37-2(b).[3]
We reject the Ritondos' contention that Dr. Jeck's direct testimony was sufficient to establish a prima facie case that Dr. Pekala had deviated from the medically accepted standard of care.
Unlike the typical negligence case, where the jury can supply the applicable standard of care from its collective knowledge, in a medical malpractice case the standard of care to which a physician should adhere must be established by expert testimony. Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985). If the plaintiff fails to do so, the complaint will be dismissed. Sanzari v. Rosenfeld, 34 N.J. 128, 135, 167 A.2d 625 (1961), R. 4:37-2(b).
The standard for granting a motion for involuntary dismissal is clearly stated in Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969),
[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.
*116 However, when proof of a particular fact is so meager or so fraught with doubt that a reasonably intelligent mind could come to no conclusion but that the fact did not exist, there is no question for the jury to decide. Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y., 22 N.J. 482, 493, 126 A.2d 323 (1956).
There are no New Jersey cases governing the effect of a witness' retraction of his direct testimony. We find persuasive a line of cases from Kentucky's highest court which stand for the proposition that the value of testimony given by a witness on direct examination may be entirely nullified by admissions on cross-examination.
Where a witness on cross-examination gives clear and unequivocal testimony that is inconsistent and contradictory of what he testified to on direct examination the force of the first statement may be destroyed.
[Spencer v. City Taxi Service, Inc., 439 S.W.2d 74, 75 (Ky. 1969); see also Ingram v. Galliher, 309 S.W.2d 763, 765 (Ky. 1958)].
Dr. Jeck completely abandoned his original opinions concerning Dr. Pekala's deviation from the medically accepted standard of care. His negation of his direct testimony was a clear and unequivocal withdrawal of his opinion. As a result, the Ritondos were left without proof of any deviation of the standard of care, a necessary element of their claim. See Rosenberg, supra, 99 N.J. at 325, 492 A.2d 371. Therefore the judge correctly granted the motion for involuntary dismissal. Sanzari v. Rosenfeld, supra, 34 N.J. at 135, 167 A.2d 625.
Affirmed.
NOTES
[1] Meconium staining is the passing of a baby's fecal matter into the amniotic fluid.
[2] The claims against other named defendants were dismissed before trial.
[3] This motion was made before the end of plaintiffs' case. However, because Dr. Jeck was the sole witness on the accepted standard of care, counsel consented to the trial judge hearing the motion.