688 A.2d 1103

PHUONG NGUYEN, PLAINTIFF–RESPONDENT, v. ALBERT TAMA, M.D., DR. MACCARONE, M.D., SUE SHERMAN, K. GRIPPI, E. BOALE, AND COOPER HOSPITAL/UNIVERSITY MEDICAL CENTER, DEFENDANTS, AND RONALD JAFFEE, M.D., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued January 28, 1997—Decided February 27, 1997.

Before Judges DREIER, NEWMAN and VILLANUEVA.

*Stacy L. Moore, Jr.,* for appellant (*Parker, McCay & Criscuolo,* attorneys for appellant *Mr. Moore, Jr.,* of counsel; *Frank P. Cavallo, Jr.,* on the brief).

*Carol L. Forte,* for respondent (*Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, P.C.,* attorneys; *Ms. Forte,* on the brief).

The opinion of the court was delivered by

VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).

Defendant, Ronald Jaffee, M.D. ("Dr. Jaffee" or "defendant"), plaintiff's obstetrician, appeals from a medical malpractice verdict in the amount of $1,162,100 plus prejudgment interest. We affirm.

Plaintiff became pregnant in early 1989. Plaintiff engaged the services of defendant's medical group for her prenatal care. She visited defendant's offices on April 10 and May 3, 1989, while she was in her second trimester of pregnancy. Plaintiff had additional prenatal visits on June 7, July 5, and July 25. During these checkups, plaintiff's blood pressure was recorded as 100 over 70, urine samples were negative for protein, and she had experienced normal weight gain.

Plaintiff had her last prenatal checkup on August 22, 1989. At this time, plaintiff's blood pressure was 120 over 86. She had a three plus reading for protein in her urine. Additionally, she had gained nine pounds since her previous checkup. Defendant indicated that these values, in light of the information he had regarding his patient, did not in his judgment require aggressive patient

management, such as immediate admission to the hospital to induce labor.

On August 31, 1989 at 10:00 a.m., plaintiff went to Cooper Hospital, in an advanced stage of labor. Nurse Sue Sherman admitted plaintiff to the delivery and labor unit. At 10:15 a.m., Sherman made a note in plaintiff's chart indicating that plaintiff's initial blood pressure was 170 over 120. Plaintiff was then rolled to her left side and another blood pressure reading was taken which showed that plaintiff's blood pressure had changed to 186 over 118. Sherman's note also indicated that plaintiff's reflexes were plus two and there was a "large amount of edema noted in legs." A resident on duty at this time, Dr. Maccarone, indicated that plaintiff's condition was not normal of edema in that she had "massive pitting lower extremity, edema on both sides" and that she also tested abnormally for deep tendon reflexes.

When defendant arrived on the scene, he was given plaintiff's records and was asked if he wished to administer magnesium sulfate to lower the patient's blood pressure. Dr. Jaffee did not order magnesium sulfate, nor did he order a urine test for protein.

Plaintiff's blood pressure was recorded regularly up until delivery. Plaintiff's baby was born at 12:05 p.m. and the next recorded blood pressure was at 12:45 p.m. Plaintiff suffered a stroke during or immediately after delivering the baby, her first child.

Evidence was presented to the jury indicating that there were some complications with plaintiff's delivery. Dr. Maccarone testified that there was some indication that plaintiff's delivery was slightly abnormal in that her leg fell out of the delivery stirrup. Plaintiff's expert testified that, "We do know from subsequent notes that at some point after the delivery before going to recovery, the patient was felt to have a leg falling from the stirrup and that she was particularly lethargic or drowsy."

In his deposition, defendant was asked about a visit he paid to the plaintiff after he was informed of her paralysis later on the

day of her delivery. At that time he attributed the weakness in plaintiff's leg to some cerebral accident. Later, in his deposition, defendant stated that someone made a note in plaintiff's chart that her leg had fallen off of the delivery table. On cross-examination at trial, defendant was confronted with this statement, and he stated that his deposition testimony was "obviously incorrect" and he felt the plaintiff's stroke occurred in the recovery room.

Defendant co-signed the standard postpartum orders written by Dr. Maccarone. Recovery room nurses took plaintiff's blood pressure at 12:45 p.m., 1:00 p.m. and 1:55 p.m. There were no recorded blood pressures from 1:55 to 4:00 p.m. At 4:00 p.m., Nurse E. Boale found plaintiff's right arm dangling off of her stretcher. Plaintiff was unable to control both her right arm and leg.

Plaintiff sustained a stroke to the left side of her brain which has interfered with her speech, rendered her right hand virtually useless and impaired her ability to walk. She will never be able to deal blackjack at the Atlantic City casino where she had previously been employed prior to the delivery of this child.

Plaintiff filed a complaint against the various defendants. The complaint alleged medical malpractice against defendants, Cooper Hospital, Dr. Albert Tama, Dr. Ronald Jaffee, Dr. Maccarone, Nurse Sue Sherman, Nurse K. Grippi and Nurse E. Boale. Plaintiff charged that the careless, reckless and negligent acts of the defendants, which took place over the course of her prenatal care and delivery, deviated from accepted medical standards and caused plaintiff to suffer severe, disabling and permanent injuries.

Prior to the trial, Tama, Maccarone and Sherman were dismissed as defendants. At the conclusion of the plaintiff's case after eight days of trial, defendants Cooper Hospital, Grippi and Boale were dismissed as defendants.

Ultimately, the jury found defendant, Dr. Jaffee, liable and awarded plaintiff damages in the amount of $1,162,100, which including prejudgment interest constituted a total judgment of

$1,422,155.69. Defendant filed a motion for a new trial or for judgment n.o.v. The motion was denied. This appeal followed.

I.

Plaintiff alleges that defendant was negligent in failing to diagnose and treat the condition known as preeclampsia. This condition resulted in plaintiff suffering a cerebral hemorrhage, leaving her partially paralyzed and aphasic.

Preeclampsia is a fairly common condition of late pregnancy which is characterized by an increase in the patient's blood pressure, by a tendency toward excessive weight gain and excessive fluid accumulation, and by the appearance of protein in the urine which is not normally present even during pregnancy. Its exact cause is still unknown. It affects the body by causing spasms of the blood vessels. The main dangers to the mother suffering from untreated preeclampsia are seizures, strokes, coma, brain hemorrhage and death. Obstetricians normally look for evidence of preeclampsia at every prenatal visit. This is one of the reasons that the patient's blood pressure and weight are checked, why the extremities are checked for signs of edema, (excessive fluid accumulation), and why the urine is tested for the presence of protein. Preeclampsia causes an elevation in blood pressure which can range from mild to severe or profound. The increased blood pressure in turn causes spasm of the blood vessels with resulting damage to the vessel.

The hospital records, which were admitted into evidence, contain a preprinted form used by the obstetrical department, on which there is printed a "checklist", and the definition of preeclampsia. On a page from the patient's own hospital chart, "severe preeclampsia" was defined as blood pressure greater than 160/110, or proteinuria greater than "2 +" after 26 weeks of gestation. We noted earlier that the patient's blood pressure had been as high as 186 over 118.

Plaintiff's treating neurologist, Dr. Hillard Scharf, testified that plaintiff had suffered an intracerebral accident. This "accident"

caused language dysfunction and right side paralysis. These conditions are permanent. Another expert, Dr. Edward Feldman, a leading neurologist called by plaintiff, indicated that, based on a review of plaintiff's patient record, this stroke was caused by high blood pressure and occurred either during plaintiff's delivery or just after it in the recovery room. Dr. Feldman told the jury that the untreated high blood pressure of preeclampsia is a known cause of intracerebral hemorrhage, and that plaintiff's blood pressures upon admission were capable of causing this hemorrhage. He concluded by testifying that if the patient had received medication to treat her preeclampsia and lower the blood pressure after it was found to be 180/118, it was more likely than not her stroke would have been prevented.

Dr. Harlan Giles, a perinatologist, testified that Dr. Jaffee had been negligent at three distinct times. First, Dr. Jaffee was negligent on the last prenatal visit when he failed to diagnose preeclampsia and either order a follow-up blood pressure check the next day or admit her to the hospital. Second, he was negligent prior to delivery when he again failed to diagnose preeclampsia and did nothing to treat it and neglected to address her blood pressure. At this point Dr. Jaffee should have ordered magnesium sulfate to relax the spastic vessels, and assess its effect on the blood pressure, ordering additional antihypertensives if necessary. Third, he was negligent after the delivery by failing to order frequent blood pressure checks and again in failing to continue the magnesium sulfate for twelve to twenty-four hours after the birth.

## II.

Defendant raises five points on this appeal, none of which has merit. Defendant first contends that plaintiff's principal expert, Dr. Giles, offered only a net opinion. "The 'net opinion' rule appears to be a mere restatement of the established rule that an expert's bare conclusions, unsupported by factual evidence, is inadmissible. It frequently focuses ... on the failure of the

expert to explain a causal connection between the act or incident complained of and the injury or damage allegedly resulting therefrom." *Buckelew v. Grossbard,* 87 *N.J.* 512, 524, 435 *A.*2d 1150 (1981). For an expert opinion to be admissible at trial it must be based "primarily on facts, data or other expert opinion established by evidence at the trial...." *Id.* at 525, 435 *A.*2d 1150 (quoting *Evid. R.* 56(2)(a), currently embodied in *N.J.R.E.* 703).

Dr. Giles' opinion was supported by his references to defendant's office records, the hospital records and his own experience. His opinion was confirmed by the *Williams* text that defense counsel used to cross-examine him. This was clearly not a net opinion.

Defendant also contends that Dr. Giles used the wrong standard of practice and only stated what he thought the standards should be. Dr. Giles was repeatedly asked what the accepted standard of medical practice was and answered each question according to that standard. At one point he stated that the accepted standard is what "he thought" was the minimum standard that doctors should apply. Defendant argues that Dr. Giles' reference to his own opinion, when stating the minimum standard that doctors should apply, shows that his testimony was completely subjective. Defendant's argument is flawed. This witness was a professor at two major medical schools which aided him in knowing what he thought was a minimum standard. The standard to which Dr. Giles testified comported with the textbook with which he was cross-examined. Even the defense expert acknowledged the same standard in his testimony. Therefore, contrary to defendant's assertion that the testimony of Dr. Giles was completely subjective, Dr. Giles testified to the proper standard.

### III.

Defendant next contends that Dr. Giles testimony should have been disregarded because it was against the weight of the evidence and in conflict with *Ritondo v. Pekala,* 275 *N.J.Super.* 109, 645 *A.*2d 802 (App.Div.), *certif. denied,* 139 *N.J.* 186, 652 *A.*2d

174 (1994). We are satisfied that the expert's testimony was in complete accord with the weight of the evidence. Furthermore, the *Ritondo* case involved a situation where an expert recanted his opinion. This did not happen here.

Plaintiff proved conclusively that she suffered from preeclampsia. Plaintiff's eminently qualified principal expert witness as well as her neurological expert clearly established the diagnosis, and this was even confirmed by defendant's expert. It is also clear that defendant should have administered magnesium sulfate initially, and then if the blood pressure did not come down, should have administered other anti-hypertensive drugs. He also should have taken a protein reading of plaintiff's urine, given the findings at the last office visit. It appears that even one of the hospital nurses recognized the problem and suggested to the defendant that magnesium sulfate be administered, but nothing was done. Defendant's expert could not overcome this conclusion.

## IV.

Defendant claims that juror number three was dismissed without cause. Defendant notes that *R.* 1:8–2(d) permits a court to dismiss a juror for good cause in a civil trial. However, defendant argues that a hearing was required to determine if that standard was met, citing *State v. Reevey,* 159 *N.J.Super.* 130, 134, 387 *A.*2d 381 (App.Div.), *certif. denied,* 79 *N.J.* 471, 401 *A.*2d 228 (1978). Defendant additionally states that the court may not take into consideration a juror's interaction with other jurors in deciding whether to dismiss, citing *State v. Valenzuela,* 136 *N.J.* 458, 468–73, 643 *A.*2d 582 (1994). Defendant concludes that in improperly dismissing juror number three the court abused its discretion, and a new trial is warranted.[1]

At the close of testimony one day, the trial judge was informed by a juror that juror number three ("Black") was making some

---

[1] One juror had already been dismissed from service in this case because she was a patient of defendant's medical group. With the dismissal of juror number

comments regarding the case in the jury box during testimony. The judge decided that it would be appropriate to question the jurors regarding Black's comments. At a hearing, two other jurors informed the court that they had heard Black expressing thoughts regarding the case. Preliminarily, Black indicated that she had formulated an initial opinion and could no longer be impartial. The judge expanded his explanation of her responsibilities, and she stated that she felt that she was "not locked in" to one side and could remain fair and impartial.

The trial judge found, based on Black's comments, that she should be dismissed from jury service, primarily because "apparently on more than one occasion she has spoken to other jurors contrary to the court's instruction."

The defendant does not contend that his right to a jury trial was harmed or that the dismissal of this juror led to a finding of liability from an inadequate jury. The trial judge exercised sound discretion in dismissing this juror based on the reasons enumerated in the record, which discloses that juror number three attempted to influence other jurors about the case and entreated them to discuss the issues prior to deliberations when instructed not to do so. Moreover, in a commentary-like fashion, she exhibited facial mannerisms and made audible sounds during the trial, behavior which the juror claimed to be unaware of or at least did not admit. Furthermore, a party in a civil case "is not entitled to any particular juror, but only to an impartial jury of [6] individuals." *State v. Reevey, supra,* 159 *N.J.Super.* at 134, 387 *A.*2d 381 (citing *State v. Belton,* 60 *N.J.* 103, 108, 286 *A.*2d 78 (1972)).

### V.

Defendant argues that the alteration of one word in one of the jury charges led the jury to find him liable unjustly. Defen-

---

three, the court had six jurors and no alternates who could deliberate in this matter.

dant requested that a particular charge be given to the jury as follows:

> In examining the conduct of a defendant physician to determine whether there was a deviation from [an] accepted standard of care, that is whether he was negligent, you should understand that the law recognizes that the practice of medicine is not an exact science. Therefore, the law recognizes that the practice of medicine according to accepted medical standards *will* not prevent a poor or unanticipated result. If a physician has applied the required knowledge, skill and care in the diagnosis and/or treatment of a patient, he is not negligent simply because a bad result has occurred.
>
> [*See Model Jury Charge, Civil* § 5.36A (emphasis added.) ]

Over defendant's objection, the trial judge charged the jury with this exact charge with the exception that the word "may" was substituted for the word "will." Defendant contends that this change altered the meaning of the charge to such a degree that a new trial is warranted. We disagree.

A reading of the charge in this case indicates that the trial judge was correct in substituting the word "may" for "will" in his charge to the jury. The use of the word "will" does not make sense in reference to the charge as a whole. The charge cautions the jury that there are some situations when a doctor fully complies with the accepted standard of medical care and, still, a bad result can occur. In such a situation, the jury is not required to find the doctor liable. In other words, this charge reminds the jury they must find that the doctor deviated from the accepted standard to find him liable, not just that a bad result happened. The Supreme Court in *Schueler v. Strelinger*, 43 *N.J.* 330, 204 *A.*2d 577 (1964), noted that, although a good result may occur with poor treatment, good treatment will not necessarily prevent a poor result. *Id.* at 344, 204 *A.*2d 577. Despite this statement, the *Model Charge* has remained unchanged.

As a result of the use of the word "may," the jurors would properly understand that bad results are sometimes inevitable in

medical situations. This would be common sense to the average person or juror. Obviously, the word should be "may".[2]

## VI.

Lastly, defendant contends that plaintiff should not have been permitted to remark during closing argument that the defense failed to produce any expert testimony concerning recovery room conduct. Defendant twists the facts of what had transpired. Defendant's expert had been instructed by defendant's attorney at depositions not to answer a question concerning the recovery room conduct. Having been so instructed, plaintiff at trial demanded that the witness not be permitted to testify on this subject. Since defendant had produced no other witness on this subject, he had no testimony to rebut plaintiff's claims concerning what the recovery room conduct should have been. Plaintiff's comment on summation that the defense expert had not testified in this area was proper. Defendant cannot complain about a problem that he created.

Furthermore, there is no indication that this statement led to an unjust result. *R.* 2:10–2. The statement related to only one area of potential negligence, defendant's conduct after delivery. This left two other possible grounds for finding negligence: during the last prenatal check up and immediately prior to and during delivery.

Affirmed.

---

[2] We suggest that the Committee on Model Jury Charges, Civil change this particular charge in accordance with this opinion.