**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5250-15T3

LYNDA K. DILLMAN,

    Plaintiff-Appellant,

v.

KENNETH PETRIE, ESQ. and PETRIE,
COTRONEO & GOSSNER, LLC,

    Defendants/Third-Party
    Plaintiffs-Respondents,

v.

STEVEN C. CHAIT, CPA/ABC, and
CHAIT & ASSOCIATES, INC.,

    Third-Party Defendants.

_____

        Argued May 1, 2018 — Decided August 30, 2018

        Before Judges Mawla and DeAlmeida.

        On appeal from Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0318-14.

        Kenneth S. Thyne argued the cause for appellant (Roper & Thyne, LLC, attorneys; Kenneth S. Thyne, on the brief).

        John R. Gonzo argued the cause for respondents (L'Abbate, Balkan, Colavita & Contini, LLP,

attorneys; John R. Gonzo, of counsel and on the brief; Jason Mastrangelo, on the brief).

PER CURIAM

Plaintiff Lynda K. Dillman appeals the June 27, 2016 order of the Law Division granting summary judgment in favor of defendants Kenneth Petrie, Esq., and Petrie, Cotroneo & Gossner, LLC (PCG), on her legal malpractice claims. We affirm.

I.

The following facts are taken from record. Plaintiff and Scott Dillman were married in November 1980. On June 29, 2006, Scott[1] filed a complaint for divorce. Plaintiff retained Petrie to represent her in the divorce proceedings. During the course of the proceedings Petrie became a partner at PCG.

On January 17, 2008, the parties entered into a property settlement agreement (PSA). They placed the terms of the agreement on the record before a court reporter at the office of Scott's attorney. The PSA provides that plaintiff would receive limited duration alimony ending on January 31, 2017. In exchange for the irrevocable termination of alimony in 2017, plaintiff received a $150,000 credit from Scott's share of the equity in the marital home. She agreed to purchase Scott's remaining interest in the

---

[1] Because the Dillmans share a last name we identify Mr. Dillman by first name. No disrespect is intended.

A-5250-15T3

marital residence, and he agreed to pay off an outstanding home equity loan on the home. Scott also agreed to contribute $27,000 towards plaintiff's credit card debt. Plaintiff agreed to be responsible for child-related expenses while she was the primary parent of residence, and Scott agreed to pay eighty-five percent of the college tuition costs for their youngest child's three remaining years of college. The couple's older child was an adult.

At the time of the divorce, Scott was an equity partner in PricewaterhouseCoopers (PWC). The PSA provides that Scott's PWC capital account, and vested pension accounts would be distributed forty percent to plaintiff and sixty percent to Scott. The agreement does not address distribution of Scott's unfunded PWC modified partner retirement plan. At the time the divorce complaint was filed, Scott had an unvested interest in the retirement plan. His interest in the plan vested by the time that the PSA was executed. The plan, however, would not enter pay status until Scott retired.

On January 25, 2008, the parties appeared in the Family Part to enter the terms of the PSA on the court record. Plaintiff testified that she understood the agreement was a compromise, and agreed it was fair and equitable under the circumstances. She also stated that she did not have a medical or psychological condition preventing her from understanding the PSA. Plaintiff

acknowledged that she was giving up her right to a trial and that "we're cutting our losses." Plaintiff told the court that she was satisfied with defendants' legal services. The court accepted the terms of the PSA.

On June 29, 2008, the court entered a dual final judgment of divorce incorporating the terms of the PSA. The judgment stated that "the parties have each voluntarily entered into the agreement and have accepted the terms thereof as fair and equitable."

On June 12, 2009, plaintiff filed a motion in the Family Part to modify the terms of the PSA. In a certification in support of the motion, she asserted that changed circumstances warranted an increase in alimony, and a modification to make alimony permanent. Plaintiff claimed that her economic opportunities had been limited by mental illness, and that the economic recession had "drastically affected" her earning potential. The court denied the motion on August 14, 2009.

In November 2012, plaintiff hired new counsel and filed another motion to vacate the final judgment of divorce and PSA, or in the alternative, to schedule a plenary hearing after the exchange of discovery. Plaintiff argued that at the time she entered into the PSA she was mentally impaired and did not fully comprehend its terms. She also argued defendants did not properly

counsel her with respect to the settlement agreement, or protect her interests in the divorce proceedings.

On January 11, 2013, the Family Part denied plaintiff's motion, finding that she failed to produce sufficient evidence to show that she had been unable to understand the PSA when she agreed to its terms. We affirmed that decision on May 21, 2014. <u>Dillman v. Dillman</u>, No. A-2645-12 (App. Div. May 21, 2014) (slip op. at 19).

On January 27, 2014, almost six years after entry of the final judgment of divorce, plaintiff filed a complaint against defendants, alleging legal malpractice and related claims arising from their representation of plaintiff in the divorce action. She alleges that defendants counseled her to accept a settlement agreement that "did not in any way reflect the range of likely recovery [p]laintiff would receive in her divorce proceeding." In addition, plaintiff alleges that defendants did not account for her mental incapacity when counseling her on the settlement. At the time that plaintiff filed the complaint, the appeal of the Family Part's denial of her motion to vacate or modify the PSA based on her mental capacity was pending in this court.

On May 13, 2016, after the parties exchanged discovery, and after we affirmed the Family Part's denial of plaintiff's motion to vacate or modify the PSA, defendants moved for summary judgment.

At that point, plaintiff had abandoned all but two arguments in support of her claim of malpractice: (1) that the forty-percent distribution from Scott's PWC capital account, and vested retirement assets was insufficient because of defendants' inadequate advice; and (2) that defendants' failure to consider Scott's PWC unfunded retirement plan as an asset subject to distribution resulted in an inadequate settlement.

In support of their motion defendants relied, in part, on the expert report of Vincent P. Celli, Esq. He opines that the forty-percent distribution of Scott's PWC capital account, and vested retirement assets correctly reflects the fact that these were Scott's business assets. In support of his opinion, Celli notes that no legal precedent requires that marital assets be distributed fifty percent to each party. He also opines that the forty-percent distribution to plaintiff was the product of negotiations which were motivated, in part, by plaintiff's desire to retain the marital home. With respect to the unfunded PWC retirement plan, Celli opines that the plan's value was too speculative to be quantified at the time that the PSA was negotiated. He notes that it was possible that the plan might never be funded and that

> there being nothing in this record that
> identifies how the asset was distributed
> between the parties or for what other
> consideration it may not have been considered
> an asset by the parties at all, the handling

of this asset cannot be said to have been professionally negligent.

Plaintiff opposed the motion. She relied on the expert reports of Dale E. Console, Esq., and Kalman A. Barson, CPA. Console, after setting forth the legal standards defining an attorney's obligations to a client in the context of a distribution of marital assets, opines that

> [t]he agreement divides Scott's capital account with PWC as well as most of the retirement assets derived from his employment with [plaintiff] receiving 40% of those. Mr. Petrie states in his deposition that that distribution was because it was his business. I find no legal basis for that assumption. It is true that business assets are not always divided on an equal basis but that is where the business value is based upon intangible value including good will which does not exist in this case. Even when that exists, the retirement assets are never divided on that theory. This is a deviation from the standard of care. The damages that result are the difference between the 40% [plaintiff] received and the 50% to which she was entitled. The differential comes to $31,260.

Conversely, Console's report notes that "[m]atrimonial litigants often have an [emotional] attachment to the marital residence" and "are often willing to trade off on other things solely in order to keep the house." She continues,

> [t]he other intangible on any settlement is the fact that litigants may not want to try the case. Trials are enormously stressful. They carry a degree of [uncertainty]. In this case, if [plaintiff] had tried the case, based

on the known facts, she probably would have received more alimony but she would not have been able to refinance and keep the house after a trial. She, at that time, may very well have been willing to settle for less than she otherwise might have received in order to avoid the stress and uncertainties of the trial and future litigation.

With respect to Scott's unfunded PWC retirement plan, Console opines that

> [t]his is an unfunded retirement plan which was not vested when the complaint was filed but was vested by the time of the divorce.
>
> . . . .
>
> This is a substantial marital asset that was not distributed in the divorce. The fact that it was not vested when the complaint was filed is irrelevant under the law. Mr. Petrie was plainly on notice the asset, which is also listed on Scott's CIS, existed but failed to deal with it. That is malpractice. The damages are the amount that [plaintiff] would have received. I am not qualified to make that calculation as it requires an expert.
>
> Mr. Barson is correct that this is not an ERISA qualified plan and therefore was not eligible for a Qualified Domestic Relations Order (QDRO). However, there are plans of this nature that will allow a Domestic Relations Order (DRO) which would divide the benefit so that the alternate payee would receive periodic payments over time. This should have been investigated. The preferred method is to have [the] coverture portion of the plan valued and paid out as a lump sum but that requires an expert.

A-5250-15T3

Barson's report contains his opinion of the value of Scott's interest in the unfunded PWC retirement plan. Using a coverture fraction, Barson opines that Scott's interest in the plan at the time of the divorce ranged from $342,600 to $463,500. His opinion is based on present value discount rates of four, five, and six percent, which he concludes to be "the most likely rates that would be applied under the circumstances at hand." He provides no explanation of how he identified those discount rates as the most likely to be applied, or any data supporting his conclusion.[2]

The trial court granted summary judgment in favor of defendants. The court concluded that plaintiff could not prove she was damaged by any alleged acts of malpractice because she relied on pure speculation when arguing that had defendants provided her with better legal advice, Scott would have been willing to settle for anything other the terms in the PSA, or that the trial court would have approved distribution to her of anything more than what was contained in the PSA, if there had been no agreement. The court explained its reasoning as follows:

> No one, no one, particularly plaintiff's expert, Dale Console, could say what Mr. Dillman would have settled for.

---

[2] Notably, Console found Barson's expert report "[w]ith certain exceptions," to be "almost entirely without merit." She does not identify which portions of Barson's report she finds credible.

The only one who could say that is Mr. Dillman. And actually he can't even say what he would have settled for, because if he were to say it now, he'd be in effect saying either I think I would have settled for something other than what I did, or I would not have.

. . . .

And, again, . . . it would be a worthless assumption to try to project what Mr. Dillman would have agreed to or would not have agreed to.

And this case can[not] proceed on the assumption as to what Mr. Dillman would have agreed to or would not have agreed to if an alternative settlement opportunity had been presented to him. He might have jumped at it, he might not have.

. . . .

And the other critical thing that I think needs to be noted . . . is, no one could predict or prognosticate what [the Family Part judge] would have done if the case did[ not] settle and [was] tried before him. The only person who could do that is [the Family Part judge].

. . . .

So, I am of the opinion that summary judgment should be granted in favor of the defendants in this case.

The court also noted that it found Barson's opinion to be "pure conjecture and speculation" and "beyond . . . a net opinion."

In addition, the trial court held that plaintiff's malpractice claims were not ripe because she had not moved in the

Family Part to vacate or modify the PSA based on the parties' failure to consider the unfunded PWC retirement plan as an asset subject to distribution. The court held that were plaintiff to seek such relief and be unsuccessful, she could then file a malpractice claim against defendants. The court acknowledged, however, that such a claim might be time barred.[3]

This appeal followed.

## II.

We review the trial court's decision granting summary judgment de novo, using "the same standard that governs trial courts in reviewing summary judgment orders." Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div. 1998). Rule 4:46-2 provides that a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." In addition, we review the record "based on our consideration of the evidence in the light most favorable to the

---

[3] The trial court also held that plaintiff's claims related to her mental capacity were resolved by this court's May 21, 2014 opinion and could not be raised in the malpractice action. Plaintiff does not appeal that aspect of the trial court's decision.

parties opposing summary judgment."  <u>Brill v. Guardian Life Ins. Co.</u>, 142 N.J. 520, 523 (1995).

"[T]he movant must show that there does not exist a 'genuine issue' as to a material fact and not simply one 'of an insubstantial nature'; a non-movant will be unsuccessful 'merely by pointing to <u>any</u> fact in dispute.'"  <u>Prudential</u>, 307 N.J. Super. at 167 (quoting <u>Brill</u>, 142 N.J. at 524).  Self-serving assertions that are unsupported by evidence are insufficient to create a genuine issue of material fact.  <u>Miller v. Bank of Am. Home Loan Servicing, L.P.</u>, 439 N.J. Super. 540, 551 (App. Div. 2015). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'"  <u>Hoffman v. Asseenontv.Com, Inc.</u>, 404 N.J. Super. 415, 426 (App. Div. 2009) (citations omitted).

It is well settled that "the elements of a cause of action for legal malpractice are (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff."  <u>Kranz v. Tiger</u>, 390 N.J. Super. 135, 147 (App. Div. 2007) (quoting <u>McGrogan v. Till</u>, 167 N.J. 414, 425 (2001)).  "[A] lawyer is required to exercise that 'degree of reasonable knowledge and skill that lawyers of ordinary ability and skill possess and exercise.'"

12

Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C. v. Ezekwo, 345 N.J. Super. 1, 12 (App. Div. 2001) (quoting St. Pius X House of Retreats v. Diocese of Camden, 88 N.J. 571, 588 (1982)).

A legal malpractice claim is not barred by the settlement of the underlying lawsuit. Ziegelheim v. Apollo, 128 N.J. 250 (1992). In Ziegelheim, after "extensive negotiations" in a divorce proceeding, the client agreed to accept a settlement that she affirmed on the record was fair and equitable. Id. at 257-58. Dissatisfied with the settlement, she later sued her former lawyer for malpractice, alleging that because of the attorney's inadequate representation, she agreed to a settlement far less than what she could have obtained had she gone to trial. Id. at 255-57. She alleged that the attorney failed to discover approximately $149,000 in marital assets and to advise her adequately about what she might have received if she went to trial instead of accepting the settlement. Id. at 255-57.

The Supreme Court rejected "the rule . . . that a dissatisfied litigant may not recover from his or her attorney for malpractice in negotiating a settlement that the litigant has accepted unless the litigant can prove actual fraud on the part of the attorney." Id. at 262. The Court concluded that the "fact that a party received a settlement that was 'fair and equitable' does not mean

13

necessarily that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." Id. at 265. The Court explained that clients rely on their attorneys to advise them what constitutes a fair settlement under the circumstances, and that a competent lawyer is obligated to help his client understand "the likelihood of success" of the case and "the range of possible awards," even if the client ultimately chooses another path. Id. at 263. The Court warned, however, that its decision was not meant to "open the door to malpractice suits by any and every dissatisfied party to a settlement" and that "[m]any such claims could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties." Id. at 267.

The holding in Ziegelheim clearly provides that a claim of legal malpractice alleging deficient advice resulted in a client's acceptance of an inadequate settlement agreement is a valid cause of action. It is permissible for a jury, with the aid of expert testimony, to determine whether a settlement recommended to a client was outside the range of awards she could have expected to receive had she been provided with sound legal advice. It is also permissible for a jury to determine that a client would have secured a more favorable settlement had she not been provided

14                                                                    A-5250-15T3

inadequate advice from counsel. Thus, the trial court here erred when it held that summary judgment was warranted because no jury could determine whether plaintiff would have negotiated a more favorable settlement agreement, or secured a more favorable outcome at trial, had defendants provided her with adequate legal advice.

Nor do we agree with the trial court's conclusion that plaintiff's malpractice claim is not ripe until she unsuccessfully seeks relief with respect to Scott's PWC unfunded retirement plan in the Family Part. The Supreme Court rejected this argument in Guido v. Duane Morris, LLP, 202 N.J. 79 (2010). There, the defendants in a legal malpractice action urged the Court to "require that the malpractice plaintiff first try to vacate the settlement, and that a malpractice claim should lie only if those efforts fail." Id. at 95. The Court held that while a prior attempt to vacate a settlement may be a relevant factor, "the failure to do so cannot be, in and of itself, dispositive" of the legal malpractice claim. Id. at 96.

We agree with the trial court's conclusion, however, that plaintiff's experts offered net opinions and affirm the order

granting summary judgment on this basis.[4]  For an expert's opinion to be meaningful to the trier of fact, it must be based on credible facts and data.  As we held in Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002):

> As construed by applicable case law, N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial.  Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); Nguyen v. Tama, 298 N.J. Super. 41, 48-49 (App. Div. 1997).  Under the "net opinion" rule, an opinion lacking in such foundation and consisting of bare conclusions unsupported by factual evidence is inadmissible.  Johnson v. Salem Corp., 97 N.J. 78, 91 (1984), Buckelew, 87 N.J. at 524.  The rule requires an expert to "give the why and wherefore" of his or her opinion, rather than a mere conclusion.  Jimenez v. GNOC Corp., 286 N.J. Super. 533 (App. Div. 1996).

With respect to the distribution of marital assets in the PSA, Console offered the opinion that plaintiff was "entitled" to a fifty-percent distribution.  Console cites no legal support for this proposition.  In fact, legal precedents reject the notion that a spouse is presumed to be entitled to an equal share of marital assets.  As we recently stated:

> The equitable distribution statute "reflects a public policy that is 'at least in part an acknowledgement that marriage is a shared

---

[4] As noted above, the trial court expressly found that Barson offered a net opinion.  Our review of the record leads us to the conclusion that Console also offered a net opinion.

> enterprise, a joint undertaking, that in many ways . . . is akin to a partnership.'" Thieme v. Aucoin-Theime, 227 N.J. 269, 284 (2016) (quoting Smith v. Smith, 72 N.J. 350, 361 (1977)). But, equitable is not synonymous with equal. See Rothman v. Rothman, 65 N.J. 219, 232, n.6 (1974). Our courts must remain true to the legislative mandate expressed in N.J.S.A. 2A:34-231, which assures an ordered equitable distribution to be "designed to advance the policy of promoting equity and fair dealing between divorcing spouses." Barr v. Barr, 418 N.J. Super. 18, 45 (App. Div. 2011). This requires evaluation of unique facts attributed to each asset.
>
> [Slutsky v. Slutsky, 451 N.J. Super. 332, 358 (App. Div. 2017).]

Console provided no rationale for her conclusion that a forty-percent distribution to plaintiff was inequitable. Nor does Console square her opinion with her observation that plaintiff's desire to maintain the marital home, an outcome not likely if the matter went to trial, could have influenced her to accept a smaller distribution of assets than that to which she might otherwise claim entitlement.

In addition, although Console explains the basis for her opinion that Scott's PWC unfunded retirement plan is an asset that should have been considered when negotiating the PSA, she admits that she does not have the expertise to opine as to value of Scott's interest in the plan. Barson's opinion on the value of the plan was rejected by the trial court as a net opinion. We

17

find ample support in the record for the trial court's conclusion. The key element of Barson's analysis is the correct discount rate to determine the present value, as of the date of the filing of the divorce complaint, of Scott's interest in the retirement plan. He provides three opinions of value based on three discount rates.

He does not explain how he selected those discount rates, which he describes as "the most likely rates that would be applied under the circumstances at hand." Barson provides no data, anecdotal evidence, or other support for his view of the likelihood that those discount rates would apply. This is precisely the definition of a net opinion. Nor does Barson opine as to which of the three rates would be appropriate in this instance. The three opinions of value that he offers diverge significantly, underscoring the need for an explanation of the evidence supporting the three rates.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION