901 A.2d 907

KATHLEEN BENDER, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF ROBERT F. BENDER, DECEASED, AND KATHLEEN BENDER, INDIVIDUALLY, PLAINTIFF–RESPONDENT, v. RICHARD ADELSON, M.D., MAURICE WEISS, M.D. AND SHORE HEART GROUP, DEFENDANTS–APPELLANTS, AND JANE ROES, R.N. 1–6 (FICTITIOUS NAMES, TRUE NAMES BEING UNKNOWN) AND JOHN DOES, M.D. 1–6 (FICTITIOUS NAMES, TRUE NAMES BEING UNKNOWN), DEFENDANTS.

Argued March 20, 2006—Decided July 19, 2006.

414

---

*Richard A. Grossman* argued the cause for appellants (*Grossman, Kruttschnitt & Heavey,* attorneys; *Mr. Grossman* and *Michael M. Abatemarco,* on the brief).

*Jeffrey A. Peck* argued the cause for respondent (*Drinker Biddle & Reath,* attorneys; *Mr. Peck* and *Jodi Sydell Rosenzweig,* on the brief).

Justice ZAZZALI delivered the opinion of the Court.

After plaintiff's husband died during a heart procedure, plaintiff sued his doctors for negligence, and a jury awarded plaintiff $1.6 million. The trial court, however, granted defendants' motion for a mistrial. It found that comments that plaintiff's counsel made during summation asking the jury to draw an adverse inference from defendants' failure to present certain independent experts were unfair and prejudicial because defendants had been barred from submitting the names and reports of three experts as untimely. Plaintiff appealed, and a divided Appellate Division panel reversed, holding that counsel's summation comments were factually accurate, did not exceed the bounds of proper advocacy, and that those comments that were not accurate were redressed by the trial court's curative instruction. The question concerning the propriety of counsel's summation comments is before us because defendants appealed to this Court as of right. We granted defendants' petition for certification on the issue whether the trial court abused its discretion when it barred the testimony and submission of defendants' experts' reports.

We hold that the trial court's order granting a mistrial must be reinstated. Although we find that the trial court did not abuse its discretion when it barred defendants' experts, we conclude that the summation comment made by plaintiff's counsel concerning the absence of those experts had the capacity to mislead the jury and effected a "miscarriage of justice under the law" thus requiring a new trial under *Rule* 4:49–1(a).

I.

A.

In March 1999, after experiencing pain in his back and jaw, Robert Bender, the decedent, sought treatment from Dr. Richard Adelson, an interventional cardiologist. Dr. Adelson concluded that the decedent required a cardiac catheterization, an invasive diagnostic procedure that is used to assess the status of a patient's

arteries. Thereafter, the decedent was admitted to Jersey Shore Medical Center, and Dr. Adelson performed the procedure with Dr. Maurice Weiss assisting.

During the procedure, Drs. Adelson and Weiss (defendants) observed clots in the right and left arteries of the decedent's heart and determined that a percutaneous coronary intervention (PCI) was necessary. PCI involves the use of angioplasty and stent placement to unclog arteries. In the morning before the PCI began, defendants initially gave the decedent 5,000 units of Heparin, an anticoagulant used to decrease the blood's clotting. While finishing the angioplasty on the right artery, defendants administered an additional 7,500 units of Heparin and prepared for a second angioplasty on the decedent's left arteries. During that second angioplasty, the decedent's left anterior descending artery and diagonal artery closed, and defendants administered 2,000 additional units of Heparin and two doses of Integrilin, another anticoagulant, to the decedent.

After finishing that procedure, defendants moved the decedent to a holding area. A half-hour later, the decedent became restless, experienced back pain, vomited, and had seizures. Later, the decedent experienced low blood pressure, had another seizure, and defendants administered CPR. The decedent was rushed to the operating room where another doctor performed open-heart surgery. Unfortunately, that effort was unsuccessful, and the decedent entered into a coma and died. The decedent was forty-three years old at the time of his death and had two children, who were eighteen and ten years old.

### B.

On April 5, 2000, plaintiff Kathleen Bender, the decedent's wife, filed a complaint alleging negligence and naming Dr. Adelson, Dr. Weiss, Shore Heart Group, and unnamed doctors and nurses as defendants. The pre-trial proceedings, which we detail here because they serve in part as the basis for this appeal, involved various extensions and delays.

Discovery originally was scheduled to end on September 27, 2001, but on September 5, 2001, the parties and the trial court agreed to a sixty-day extension. Soon thereafter, the trial court set a January 28, 2002 trial date. On September 25, 2001, plaintiff submitted her expert reports to defendants. Those reports were prepared by Dr. Michael Lux, an interventional cardiologist, and Dr. Ronald Sacher, a hematologist, and were dated April 7 and October 21, 2000. Then, on January 11, 2002, the court again extended discovery until July 11, 2002, and adjourned the trial date as a result of defendants' unopposed motion.

Because defendants had not yet submitted their expert reports, on March 27, 2002, plaintiff moved to compel their production by April 29, 2002. The trial court granted plaintiff's motion, ordering that "any defense expert whose report is not served by April 29, 2002 [will be barred] from testifying at trial." To comply with the order's deadline, defendants identified themselves as experts on April 26, 2002. Defendants also sought more time to identify additional experts. Plaintiff consented, and, on May 17, 2002, the trial court entered an order allowing expert reports until May 29, 2002. The order contained the same exclusionary language as the prior month's order, indicating that "any defense expert whose report is not served by May 29, 2002 shall be barred from testifying at trial." Eight days prior to the May 29 deadline, defendants submitted to plaintiff the name and report of Dr. Mark Hochberg, a cardiac surgeon. After the May 29 deadline, in letters dated June 25 and July 8, 2002, defendants requested plaintiff's permission to amend their answers to plaintiff's interrogatories and submitted the names and reports of three additional experts: Drs. Samin Sharma and E. Scott Monrad, interventional cardiologists, and Dr. Stephen M. Factor, a pathologist.

Plaintiff responded in a letter dated July 11, 2002, formally objecting to defendants' untimely submission of the three additional experts. Also, in a notice dated July 11, 2002, the trial court set a new trial date for September 11, 2002. Then, on July 19, 2002, defendants moved before the trial court to admit the names and

reports of the three experts, extend discovery, and adjourn the trial date. At a hearing before the motion judge, defense counsel explained the untimely submission of the three experts by stating that "we litigants are to a vast degree at the mercy of people who are willing to be experts in cases like this. It was a long process of trying to find the right people, and some of them just didn't want to become involved." Defense counsel also argued that admission of the late experts was necessary to ensure a fair trial because Dr. Hochberg, the only independent and timely expert, did not have the requisite expertise.

> [Dr. Hochberg is] not an evasive [sic] cardiologist. He's done maybe six procedures. He's not a pathologist. He's not a hematologist. We've got him because we had these deadlines and we were trying to find somebody who would write a report. So he's been deposed and he is vaguely knowledgeable about this area, but nowhere near the kind of specialties that the plaintiff's experts have and the ones that we finally were able to locate.

Plaintiff's counsel responded by arguing that Dr. Hochberg could adequately testify as an expert witness on defendants' behalf.

> Dr. Hochberg has a ten-page resume to set forth just how much he knows. I believe he is competent to testify and cover the defendant's [sic] case. I am surprised to hear that he is—and I'm quoting—"vaguely knowledgeable" about these topics. And I'm not sure how that would come out at trial, but I do believe based on his ten-page resume that this doctor can handle this case without the use of the three out of time expert reports.

Plaintiff's counsel also claimed that the untimely expert reports were merely repetitive of that submitted by Dr. Hochberg.

The motion judge denied defendants' motions to submit the untimely expert reports and to extend discovery. He cited his concern for the need to follow Best Practices, which are amendments to the New Jersey Rules of Court enacted to streamline and systematize the discovery process. Specifically, the motion judge stated that

> basically the lodestar of my opinion is that the fact that these doctors were obtained late, I think they could have been obtained sooner. Everyone knew that this anticoagulation problem existed back in September of '01 and the experts could have been obtained. There have been a number of bites at the apple, as [plaintiff's counsel] says.

The motion judge also noted that defendants already had "deviated ... on two separate occasions [from] Court Orders that have preclusionary language in [them] with respect to these remaining experts."

Defendants moved for reconsideration and submitted a certification, attempting to explain their delay in obtaining expert witnesses. The certification states that defendants began their search for experts in December 2001, but that several potential experts declined to serve on their behalf; that defendants also were delayed because they needed cineangiography films taken by plaintiff's counsel; and that informational materials asking Drs. Monrad and Factor to serve as experts were sent on May 21 and July 3, 2002, respectively, because the identities of those doctors had come to defendants' attention only a short time prior to those dates.

The motion judge denied defendants' motion for reconsideration. He stated that "there were enough extensions" and that defendants would not be "severely prejudiced" by the exclusion of the late experts because

> Dr. Hochberg's C.V. is quite impressive. I don't know how he has time to practice medicine with all the articles that he writes, but he's a Harvard graduate and I think he went to Brown undergraduate. So, it's not like [defendants are] going to be in court with some inadequate expert. And I think Dr. Hochberg should be able to advocate the defendant's [sic] position.

The motion judge found that *Rule* 1:2–2, the catch-all "relaxation rule," did not apply because defendants' "request to relax the rule in question is essentially a request that the Court excuse a lack of diligence." However, the motion judge adjourned the trial date pending resolution of defendants' motion for leave to file an interlocutory appeal. The Appellate Division subsequently denied that motion, declining to review the issue on its merits.

## C.

At trial, the parties presented competing theories concerning the decedent's cause of death. Plaintiff's experts testified that the decedent suffered from cardiac tamponade, a condition whereby

fluid in the pericardial sac, the space around the heart, pressures the heart and prevents the heart from pumping properly. Plaintiff's experts stated that the tamponade resulted from defendants' administration of excessive amounts of Heparin to the decedent, thereby causing spontaneous bleeding. The defense witnesses, defendants and Dr. Hochberg, testified that the decedent did not suffer from tamponade. Rather, Dr. Hochberg opined that the decedent suffered from anaphylaxis, which is an allergic reaction, caused by the dye or other drugs administered at the time of catheterization.

In their summations, both parties argued that the jury should credit the testimony of their experts. Defense counsel argued that defendants were the most qualified:

> You've heard from five doctors in this case, three of them have had labels of experts. The fact of the matter is that the only two doctors who have testified who haven't been labeled experts were the ones with the most expertise in this case and the ones who were actually there at the time, and that's Dr. Adelson and Dr. Weiss.

Counsel also stated that despite his education, Dr. Sacher, plaintiff's expert, had said "some foolish things" during trial and had never performed the procedure in question. Further, counsel argued that the theory of plaintiff's other expert, Dr. Lux, was not based on fact. Counsel told the jury that defendants "are life givers. They're not life takers."

In response, plaintiff's counsel attacked defendants' experts and theory of the case. First, counsel remarked on the self-interested nature of defendants' testimony:

> Now, ask yourselves where are the outside objective, independent experts in hematology for the defense? This is a bleeding and clotting case. *Where are the outside independent experts in cardiology* ? Ask yourselves whether the doctors' testimony, the defendants, was honest, was accurate, was objective, or in certain instances was their testimony self-serving and misleading?
>
> [Emphasis added.]

Second, counsel argued that Dr. Hochberg was not qualified to give an expert opinion in the matter:

> Dr. Hochberg in his time was probably a very good cardiac surgeon. He has excellent credentials in the field of cardiac surgery, but he is clearly not qualified to

give opinions in this case. It's not me saying that. It's Dr. Hochberg. And this was the cross-examination earlier today.

Q: Doctor, is it true that you don't consider yourself an expert in bleeding and clotting disorders?

A: Answer: That's not my area of expertise.

Q: Doctor, do you know how Integrilin works on platelets?

A: Well, in a very broad sense, but I'm not an expert at that. I'm not a hematologist and do not represent myself as a hematologist.

Q: Doctor, do you know the requisite therapeutic range of Integrilin when used in performing PCI in 1999?

A: Answer: I am not specifically familiar with it.

Q: More importantly, Doctor, do you know the generally accepted therapeutic range of Heparin when used with Integrilin in performing a PCI?

A: Answer, verbatim, I'm not [an] expert and don't feel comfortable giving you a number in that regard.

Q: Question: Dr. Hochberg, do you know the synergistic effect—that's the compounded effect of using both these drugs together—in the setting of over-Heparinization?

A: Answer: I don't know the answer to that question.

. . . .

[Dr. Hochberg is] admittedly not a hematologist. He's admittedly not an interventional cardiologist. He doesn't treat patients currently and hasn't since 1993 or 1995. I guess [that] was the last time he even touched a patient and 1993 was the last time he performed surgery. That's nine years ago. He doesn't have hospital privileges and he's never performed a PCI. That's not saying Dr. Hochberg is a bad man or a bad doctor. He's not. It's just a fish out of water in this courtroom. He's not familiar with the issues. He's not familiar with the medication. He's never performed the procedure.

Finally, counsel commented on what he characterized as "substantial" drops in the decedent's hematocrit levels "from the time that Heparin and Integrilin were administered" and referenced several articles in medical journals that he claimed supported his experts' theory that excessive anticoagulation can cause spontaneous bleeding.

At the close of arguments, defense counsel moved for a mistrial based on plaintiff's summation. He argued that counsel's comment regarding the lack of independent experts and his statement that Dr. Hochberg was not qualified to serve as an expert violated the doctrine of judicial estoppel in light of counsel's prior representations to the motion judge. Further, defense counsel claimed

that the medical journal articles referred to by plaintiff's counsel did not involve excessive anticoagulation and that counsel's remark concerning the decedent's falling hematocrit levels was inappropriate because no expert had testified on that subject.[1]  The trial court reserved decision on defendants' motion for a mistrial and the next morning, before the jury deliberated, gave the following curative instruction:

> I just want to correct one thing and tell you that none of the articles [referenced by plaintiff's counsel] suggest that there was excessive coagulation.... Also ... [plaintiff's counsel] mentioned to you the term hematocrit or hemoglobin readings and the suggestion to you was that these hemoglobin readings were low and that they may be indicative of bleeding.  I ask that you disregard that comment because there was no expert here who had testified that, in fact, there is a connection between that particular reading and the fact that there may have been some bleeding.

The jury subsequently found for plaintiff, awarding $1,625,000 in damages.  Approximately one month later, however, the trial court granted defendants' motion for a mistrial.  The trial court found that the "cumulative effect" of the summation comments made by plaintiff's counsel was "clearly capable of producing an unjust result" and that the comment that Dr. Hochberg was not qualified to testify as an expert in this matter violated principles of judicial estoppel in light of counsel's prior representations to the motion judge.  The trial court added that "the Best Practice Rule was never intended to become a jousting event."

Plaintiff appealed the trial court's order granting a mistrial, and a divided panel of the Appellate Division reversed in an unpublished opinion.  The panel unanimously agreed with the trial court that the comment regarding the decedent's falling hematocrit levels was improper because of the absence of expert testimony on that issue but found that the trial court's curative instruction provided an adequate remedy.  Concerning the summation comment asking where the independent hematologists and cardiologists were, the majority found that the comment was accurate

---

[1] Defense counsel also objected to the remark by plaintiff's counsel concerning the decedent's falling hematocrit levels at sidebar during counsel's summation.

because "[i]t was true that there were no independent hematologists or cardiologists supporting defendants' case at the time of trial." The majority "admit[ted] that the jury could have drawn [the] inference" that defendants were unable to obtain outside expert cardiologists to support their case but found it "determinative that defendants created this situation by their own delay." Finally, the majority held that counsel's comment that Dr. Hochberg was not qualified to serve as an expert did not violate the doctrine of judicial estoppel and that "preclud[ing] plaintiff's counsel from arguing the weaknesses in Hochberg's trial testimony would unreasonably shackle the adversary system."

Judge Payne dissented, finding that "[t]he integrity of the judicial process was not preserved here." The dissent stated that the majority's reading of counsel's comment asking where are the independent experts was "hypertechnical" and that the comment clearly inferred "that only defendants themselves viewed their conduct to have been proper in the circumstances." Further, the dissent found that the summation comment concerning Dr. Hochberg's qualifications was "inequitable" because plaintiff's counsel already had deposed Dr. Hochberg and learned of his weaknesses prior to arguing before the motion judge. The dissent concluded that the representations made by plaintiff's counsel to the motion judge "had the capacity to mislead the motion judge" and that counsel's summation comments constituted an "about-face."

Following the Appellate Division decision, defendants filed a motion for judgment notwithstanding the verdict (and subsequent motion for reconsideration) with the trial court, which the trial court denied. Defendants appealed both the denial of their motion for judgment notwithstanding the verdict and the motion judge's original order barring the three late expert reports. The Appellate Division again denied defendants' appeal, this time unanimously, finding that the motion judge did not abuse his discretion when he barred the expert reports because "[i]t is not clear that defense counsel diligently sought the necessary experts." Defendants then filed a petition for certification with this Court on the

issues of the trial court's decision to bar their three untimely experts and its decision to deny their motion for judgment not-withstanding the verdict. They also filed an appeal as of right based on Judge Payne's dissent concerning the allegedly improper summation comments by plaintiff's counsel, pursuant to *Rule* 2:2–1(a)(2). We granted certification on the issue of the untimely experts. 185 *N.J.* 266, 883 *A.*2d 1062 (2005).

## II.

### A.

We first address the issue of the three barred experts. Defendants argue that the motion judge abused his discretion in denying the submission of the names and reports of those three experts as untimely. They claim that the Best Practices amendments are not designed to yield unjust results or to be applied mechanically and that plaintiff still would have had at least two full months to depose the additional experts before trial. Defendants maintain that without the additional experts they were denied a fair trial, adding that plaintiff herself "sat" on her expert reports until the very end of discovery, despite the fact that her reports had been completed some time prior.

Plaintiff responds that the motion judge did not abuse his discretion in denying submission of the three experts' names and reports because defendants did not make a showing of exceptional circumstances or due diligence as required by the rules. Plaintiff states that defendants essentially argue that "there should be no deadlines, and each party should have endless opportunity to out-expert the other." Plaintiff adds that she did not deliver her expert reports right before the discovery end date, as defendants so claim, because discovery had been extended in accordance with defendants' request. Further, plaintiff claims that had defendants desired her reports sooner, they could have moved to compel their production.

## B.

The term "Best Practices," as referenced by the parties, describes the project undertaken by the Conference of Civil Presiding Judges, which, after significant review by the Civil Practice Committee and this Court, effected substantial changes to our Rules of Court as of September 2000. Pressler, *Current N.J. Court Rules,* comment 4 on *R.* 1:1–2 (2006). Prior to the amendment of the rules, parties to litigation were expected to complete discovery within 150 days of service of the complaint. *Notices to the Bar: Report of the Conference of Civil Presiding Judges on Standardization and Best Practices,* 156 *N.J.L.J.* 80, 82 (April 5, 1999). However, that deadline was "rarely observed," and "attorneys [were] routinely granted extensions [with] no enforced discovery end date." *Ibid.* As a result, "protracted discovery frequently necessitate[d] the postponement of scheduled trial dates," and aggrieved parties were forced to bring motions to compel discovery to resolve what largely were "relatively straightforward discovery issues." *Ibid.*

The Best Practices project resulted in rules that established a two-prong approach to ameliorate those problems and create state-wide uniformity in the discovery process. *See* Pressler, *supra,* comment 4 on *R.* 1:1–2. First, the rules lengthened the initial discovery time afforded to cases based on their complexity. *R.* 4:24–1(a) (stating that Track I cases are afforded 150 days, Track II cases 300 days, and Track III and IV cases 450 days). Second, although the amended rules still permit extensions to discovery and amendments to interrogatories, they render it substantially more difficult to obtain extensions and amendments once discovery has ended and a trial or arbitration date is set. *See R.* 4:24–1(c). The revised rules represent a carefully orchestrated compromise intended to "end[ ] the general expectation that a case [will] be reached for trial only after multiple adjournments." Pressler, *supra,* comment 4 on *R.* 1:1–2.

Of relevance to this appeal, *Rule* 4:17–7 now requires that untimely requests to amend answers to interrogatories be accompanied by a showing of due diligence:

[I]f a party who has furnished answers to interrogatories thereafter obtains information that renders such answers incomplete or inaccurate, amended answers shall be served not later than 20 days prior to the end of the discovery period.... Amendments may be allowed thereafter *only if the party seeking to amend certifies therein that the information requiring the amendment was not reasonably available or discoverable by the exercise of due diligence prior to the discovery end date.*

[Emphasis added.]

Some flexibility is retained because the parties "may consent to extend the time for discovery for an additional 60 days." *R.* 4:24–1(c). Even if the parties do not agree to an extension, a party may seek relief under *Rule* 4:24–1(c): "The court may, for good cause shown, enter an order extending discovery for a stated period, and specifying the date by which discovery shall be completed." Once an arbitration or trial date is fixed, however, "no extension of the discovery period may be permitted" unless exceptional circumstances are shown. *Ibid.* Moreover, recognizing the "burden cast both on adversaries and the court by [the] late supplying of" expert names and reports, Pressler, *supra,* comment 5 on *Rule* 4:17–4, *Rule* 4:17–4(e) states that when a party fails to provide the names and reports of its experts in its answers to interrogatories, intending to supply such information by way of amendment to its answers at a later date, the opposing party may "move for an order of the court fixing a day certain for the furnishing of that information by the answering party. Such order may further provide that an expert or treating physician whose name or report is not so furnished shall not be permitted to testify at trial."

The rules also have a catch-all relaxation provision, which provides that "[u]nless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice." *Rule* 1:1–2. However, *Rule* 1:1–2 states that the rules "shall be construed to secure ... the elimination of unjustifiable expense and delay," and commentary on *Rule* 1:1–2 indicates that it "should be sparingly resorted to." Pressler, *supra,* comment 2 on *R.* 1:1–2.

Since they were enacted six years ago, the revised rules already have made significant progress in achieving their desired effect. *See* New Jersey Judiciary Superior Court Caseload Reference Guide at 58 (2001–2005). Indeed, our courts have barred untimely requests for extensions and amendments in a number of published opinions. *See, e.g., Szalontai v. Yazbo's Sports Cafe,* 183 *N.J.* 386, 396–97, 874 *A.*2d 507 (2005); *Huszar v. Greate Bay Hotel & Casino, Inc.,* 375 *N.J.Super.* 463, 471–74, 868 *A.*2d 364 (App.Div.), *rev'd on other grounds,* 185 *N.J.* 290, 884 *A.*2d 1262 (2005); *Smith v. Schalk,* 360 *N.J.Super.* 337, 344–46, 823 *A.*2d 65 (App.Div.2003); *Zadigan v. Cole,* 369 *N.J.Super.* 123, 132–34, 848 *A.*2d 73 (Law Div.2004); *O'Donnell v. Ahmed,* 363 *N.J.Super.* 44, 52, 830 *A.*2d 924 (Law Div.2003); *Vitti v. Brown,* 359 *N.J.Super.* 40, 52–53, 818 *A.*2d 384 (Law Div.2003); *Montiel v. Ingersoll,* 347 *N.J.Super.* 246, 248–55, 789 *A.*2d 190 (Law Div.2001).

### C.

■ Applying an abuse of discretion review standard to the trial court's decision to bar defendants' requested amendments to their interrogatory answers and deny a further discovery extension, *Rivers v. LSC Partnership,* 378 *N.J.Super.* 68, 80, 874 *A.*2d 597 (App.Div.), *certif. denied,* 185 *N.J.* 296, 884 *A.*2d 1266 (2005) (citation omitted), we find that defendants failed to show "due diligence," *Rule* 4:17–7, or "exceptional circumstances," *Rule* 4–24–1(c). We therefore see no reason to upset the trial court's exercise of discretion. Defendants submitted the three disputed expert names and reports in June and July 2002, in violation of two mandatory court orders that expressly precluded the submission of experts after the dates specified and after discovery already had been extended twice. They failed to move before the trial court to accept the additional names and extend discovery prior to the setting of a final trial date. *See Ponden v. Ponden,* 374 *N.J.Super.* 1, 10, 863 *A.*2d 366 (App.Div.2004), *certif. denied,* 183 *N.J.* 212, 871 *A.*2d 90 (2005) (noting importance of set trial or

arbitration date under new rules because "raison d'etre" of amendments is "to render trial dates meaningful").

■ As noted by the trial court, defendants knew about plaintiff's excessive anticoagulation theory since September 2001, when plaintiff submitted her expert reports. Yet, defendants offer no substantively adequate explanation for their delay in proffering the three expert names and reports. They state in general terms that this matter involves complex and technical medical malpractice issues, but many cases that enter our courtrooms are complex. They state that experts with specialized training were hard to locate. But were we to extend discovery and grant amendments for every untimely request with conclusory references to specialized and hard to locate experts, we would revert to the pre-Best Practices approach to discovery—an approach that litigants, courts, and the public at large all found highly unsatisfactory. A precise explanation that details the cause of delay and what actions were taken during the elapsed time is a necessary part of proving due diligence as required by *Rule* 4:17–7 for untimely amendments to interrogatory answers and exceptional circumstances as required by *Rule* 4:24–1(c) to extend discovery after a trial or arbitration date is set. *See O'Donnell, supra,* 363 *N.J.Super.* at 51, 830 *A.2d* 924 ("Clearly, merely advising the court in conclusory terms that the attorney and the client have hectic schedules does not qualify [under *Rule* 4:24–1(c) ]. Advising the court in factual detail about how and why a schedule has prevented discovery would be a place to start. Failure to provide such detail should always be fatal."); *see also Vitti, supra,* 359 *N.J.Super.* at 49, 818 *A.2d* 384 ("Any attempt to establish either good cause or exceptional circumstances . . . should address the reasons why discovery has not been completed within the applicable discovery period and counsel's diligence in pursuing discovery during that time."); *Montiel, supra,* 347 *N.J.Super.* at 252, 789 *A.2d* 190 (finding that statement offered by attorney to prove due diligence "not substantively adequate").

Nor do defendants provide an explanation as to why they did not move for an extension of the trial court's order mandating the provision of expert names and reports by May 29, 2002, other than stating at oral argument that they assumed that there would not be a problem. Instead, defendants point to plaintiff, who they claim "sat" on her expert reports until two days before discovery ended, despite the fact that the reports were dated April 7 and October 21, 2000. The fact of the matter, however, is that although discovery originally was scheduled to end on September 27, 2001, on September 5, 2001, discovery was extended for another sixty days. Plaintiff submitted her reports within that time, on September 25, 2001. Although the record does not disclose the reason that plaintiff waited to submit her reports, had defendants desired plaintiff's expert reports sooner, defendants could have filed a motion to compel production of the reports.

Moreover, although defendants likely would have benefited at trial had the three experts been allowed to testify, defendants were able to present Dr. Hochberg, a distinguished cardiac surgeon with an impressive resumé whose name and report were submitted by defendants in a timely manner. *See Zadigan, supra,* 369 *N.J.Super.* at 133 n. 10, 848 *A.*2d 73 (barring defendant's late expert and noting that because defendant had already secured report of different expert, "defendant's case would not be placed in jeopardy if [late expert's] report were barred"). Defendants, who are interventional cardiologists and experts in their field, also were able to testify at trial and defend their position. *See O'Donnell, supra,* 363 *N.J.Super.* at 52, 830 *A.*2d 924 (barring expert whose report was produced after scheduled trial date but stating that doctor defendant "will have his ability to defend himself on the merits. He is an expert and will be permitted to testify on his own behalf."). As such, defendants were not precluded from presenting their case to the jury despite exclusion of the three experts. *Cf. Ponden, supra,* 374 *N.J.Super.* at 11, 863 *A.*2d 366 (finding that trial judge mistakenly exercised discretion in barring plaintiff's expert report when trial date was not yet scheduled and "prior expert had rendered only a net opinion that

would undoubtedly prove fatal to plaintiff's claim"); *Tucci v. Tropicana Casino & Resort, Inc.,* 364 *N.J.Super.* 48, 50, 52, 53, 834 *A.*2d 448 (App.Div.2003) (reversing trial court's decision to bar plaintiff's late expert report when, among other things, delay was caused by counsel's preoccupation with his mother's sickness and demise and barring report would result in dismissal with prejudice of plaintiff's action).

Finally, the application of *Rule* 1:1–2, the catch-all relaxation rule, would be inappropriate. That *Rule* "should be sparingly resorted to," Pressler, *supra,* comment 2 on *Rule* 1:1–2, and, in this matter, it only would serve to excuse a lack of diligence. For the above reasons, we conclude that the trial court did not abuse its discretion in denying defendants' motions.

## III.

We now turn to the summation remarks made by plaintiff's counsel. As a general matter, "counsel is allowed broad latitude in summation [and] counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd." *Colucci v. Oppenheim,* 326 *N.J.Super.* 166, 177, 740 *A.*2d 1101 (App.Div.1999), *certif. denied,* 163 *N.J.* 395, 749 *A.*2d 369 (2000) (citations omitted). Summation commentary, however, must be based in truth, and counsel may not "misstate the evidence nor distort the factual picture." *Ibid.* (internal quotation marks and citation omitted); *see also Wimberly v. City of Paterson,* 75 *N.J.Super.* 584, 604, 183 *A.*2d 691 (App.Div.), *certif. denied,* 38 *N.J.* 340, 184 *A.*2d 652 (1962) (stating that counsel may not draw inferences during summation if "there are no grounds for [such inferences] in the evidence") (citations omitted). When summation commentary transgresses the boundaries of the broad latitude otherwise afforded to counsel, a trial court must grant a party's motion for a new trial if the comments are so prejudicial that "it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a).

## A.

Defendants claim that the summation remarks made by plaintiff's counsel effected a miscarriage of justice. They state that counsel's comment asking where are the independent hematologists and cardiologists was "knowingly misleading and inaccurate" and that counsel's statement that Dr. Hochberg was not qualified as an expert violated the doctrine of judicial estoppel because it was "clearly inconsistent" with the representations that counsel made to the motion judge. Defendants further argue that the comments regarding the medical journal articles and the decedent's falling hematocrit levels were inaccurate, unsupported by expert testimony, and had the potential to distort the jury's findings.

Plaintiff maintains that her counsel's summation comments were proper and that the Appellate Division was correct in reversing the trial court's order for a new trial. Plaintiff states that counsel's comment about the decedent's falling hematocrit levels was appropriate because Dr. Adelson testified on that issue, but, even if the Court were to find that he did not, the trial court's curative instruction adequately redressed any error caused by that comment or by counsel's reference to the medical journal articles. Further, plaintiff argues that her counsel's comment involving Dr. Hochberg's qualifications did not violate the doctrine of judicial estoppel. She reasons that although counsel's representations to the motion judge concerned Dr. Hochberg's competency to testify, his summation comment spoke to the weight that the jury should afford to the doctor's testimony. Finally, plaintiff states that counsel's comment asking where are the independent experts in hematology and cardiology was not improper because that comment was a response to defense counsel's summation in which defense counsel claimed that defendants are the most qualified to serve as experts because they actually were present at the time of the events. Plaintiff states that "the jury was entitled to hear both sides" and that "[a]ny other analysis would require plaintiff's

counsel to give summation gagged and bound with one hand tied behind his back."

### B.

The trial court found that three of the summation comments made by plaintiff's counsel cumulatively were so prejudicial as to require a new trial. Because we agree that counsel's comment asking the jury to draw an adverse inference from defendants' failure to call any independent cardiologists necessitates a new trial, we begin our analysis with a discussion of that comment.

As explained, during his summation plaintiff's counsel commented on defendants' failure to call independent hematologist and cardiologist experts. He stated: "Now, ask yourselves where are the outside objective, independent experts in hematology for the defense? This is a bleeding and clotting case. Where are the outside independent experts in cardiology?" That comment implies that the reason that defendants did not present outside hematology and cardiology experts is because they could not find any such experts willing to testify on their behalf. We find no error with counsel's reference to independent hematologists in view of the fact that defendants never sought to introduce testimony from an independent hematologist. However, plaintiff's counsel knew that defendants had two independent cardiologists who were precluded from testifying for procedural reasons, namely plaintiff's own motion. Plaintiff's counsel also knew that the jury was unaware of that procedural bar, and thus the summation comment ultimately played on that ignorance and implied an untruth.

To remedy the prejudice caused by untrue statements or inferences, trial courts may, depending on the severity of the prejudice, issue a curative instruction or grant a mistrial. *See Tomeo v. N. Valley Swim Club,* 201 *N.J.Super.* 416, 421, 493 *A.*2d 544 (App.Div.1985). Our courts have found mistrials to be necessary in a number of circumstances. *See, e.g., ibid.* (granting new

trial because counsel drew false inference that defendants had no insurance and that verdict against defendants would cause them to lose their house); *Wimberly, supra,* 75 *N.J.Super.* at 602–04, 607, 183 *A.*2d 691 (granting new trial when counsel attacked plaintiff, decedent's father, and "endeavored to leave with the jury the impression that any recovery would go" only to plaintiff when counsel was charged with knowledge that plaintiff was suing in representative capacity and recovery also would go to decedent's mother and siblings); *Haid v. Loderstedt,* 45 *N.J.Super.* 547, 550, 133 *A.*2d 655 (App.Div.1957) (granting new trial because, among other things, counsel told jury that defendant already "had been subjected to the personal expense of providing counsel" when he knew that counsel was being paid by defendant's insurance).

The Court of Appeals of Missouri found that the prejudice created by an untrue inference, one substantially the same as that in this matter, necessitated a new trial. *Calvin v. Jewish Hosp. of St. Louis,* 746 *S.W.*2d 602, 605 (1988). *Calvin* involved a medical malpractice claim in which the defendant hospital was barred from submitting the name of an expert because the plaintiff filed a motion to bar the expert as untimely. *Id.* at 603–04. During his summation, the plaintiff's counsel then asked the jury to draw an adverse inference from the hospital's failure to present expert testimony. *Id.* at 605. For that and other reasons, the court remanded the matter for a new trial, stating: "When a witness' testimony is excluded on an attorney's motion, it is misconduct constituting manifest injustice and thus reversible error if that attorney requests the jury to draw an adverse inference from his opponent's failure to produce that witness. . . ." *Ibid.* (citing *State v. Hammonds,* 651 *S.W.*2d 537, 538–39 (Mo.Ct.App.1983) (finding new trial necessary when prosecutor informed jury that witness did not testify because witness did not want to perjure himself although prosecutor knew that real reason witness did not testify was that court excluded witness, on prosecutor's motion, after defendant disclosed witness to state in untimely manner)).

■ We find no abuse of discretion in the trial court's judgment that counsel's statement was so prejudicial that it resulted in a "miscarriage of justice," *Rule* 4:49–1(a), warranting a new trial. The trial was long and acrimonious, and the determination whether defendants negligently caused the decedent's death by deviating from accepted standards of medical care was not self-evident. In making that determination, the jury was wholly reliant on expert testimony, as matters of anticoagulation and cardiac tamponade are outside the purview of a juror's common knowledge. *See Rosenberg v. Cahill,* 99 *N.J.* 318, 325, 492 *A.*2d 371 (1985) ("[I]n the ordinary medical malpractice case ... a jury generally lacks the requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert." (internal quotation marks and citation omitted)). As such, hearing plaintiff's counsel infer that no independent cardiologist was willing to testify on defendants' behalf likely influenced the jury's weighing of the evidence and ultimate decision-making. *Cf. Diakamopoulos v. Monmouth Med. Ctr.,* 312 *N.J.Super.* 20, 29, 711 *A.*2d 321 (App.Div.1998) (finding new trial necessary when plaintiff's counsel made irrelevant but prejudicial comment to jury concerning defendant's credibility and issue before jury was primarily that of credibility).

■ Plaintiff argues that the adverse inference was proper in light of the missing-witness doctrine, which provides that when a party fails to call a witness who "would serve to elucidate the facts in issue," opposing counsel may ask the court to give a missing-witness instruction to the jury or draw the adverse inference him or herself. *State v. Clawans,* 38 *N.J.* 162, 170, 172, 183 *A.*2d 77 (1962). That doctrine is inapposite to this matter, however, because a crucial requirement of the doctrine is that the missing witness was available and within the party's power to produce. *Id.* at 171, 183 *A.*2d 77; *Wild v. Roman,* 91 *N.J.Super.* 410, 414, 220 *A.*2d 711 (App.Div.1966). Given the trial court's order barring the three experts, the experts were not within defendants' power to produce.

Citing *Nguyen v. Tama,* 298 *N.J.Super.* 41, 688 *A.*2d 1103 (App.Div.1997), plaintiff also claims that defendants cannot complain about a condition that they themselves created. That matter involved a malpractice claim in which the defense counsel instructed the defendant's expert not to respond to a line of questioning posed by the plaintiff's counsel during the expert's deposition. *Id.* at 53, 688 A.2d 1103. The plaintiff's counsel then successfully moved at trial to bar the expert from testifying on the issue and drew an adverse inference on summation concerning the expert's failure to testify about the issue. *Ibid.* The court held, among other things, that the defendant could not complain about a situation that the defendant created. *Ibid.* We find that *Nguyen* is not relevant to this matter because here our principle concern is that plaintiff's inference implied an untruth—that defendants were unable to obtain independent cardiologists to testify on their behalf—and that the untruth likely affected the jury's decision-making. In *Nguyen,* no such untruth existed because the defense counsel chose to instruct the expert not to testify about the disputed issue during the expert's deposition, and the defendant sought to produce no other witnesses on the subject. *Ibid.*

Finally, plaintiff cites *Lovenguth v. D'Angelo,* 258 *N.J.Super.* 6, 609 *A.*2d 47 (App.Div.1992), *appeal dismissed,* 133 *N.J.* 417, 627 *A.*2d 1128 (1993), for the proposition that improprieties at trial may be permitted to right the wrongs committed by the opposing party. Plaintiff claims that she was entitled to respond to defense counsel's summation comment that defendants were the most qualified experts. We fail to see the relevancy of *Lovenguth* to the matter before us because plaintiff does not allege that defense counsel erred in his summation to the jury.

## C.

We briefly address the remaining disputed summation comments to provide guidance to the parties on remand. In respect of the comment made by plaintiff's counsel regarding the decedent's falling hematocrit levels, we agree with the Appellate

Division that although the comment was improper in view of the absence of expert testimony on that issue, the trial court's curative instruction provided adequate redress. Indeed, nothing in the record indicates that the jury had difficulty complying with that instruction. The same conclusion obtains concerning counsel's comment about the medical journal articles, which the trial court's curative instruction corrected. We trust that those comments will not be repeated on remand.

Concerning counsel's summation remark about Dr. Hochberg's expertise, we find the remark generally acceptable with one qualification. The gravamen of the remark involved merely repeating Dr. Hochberg's own statements on cross-examination. As the Appellate Division found in rejecting defendants' judicial estoppel claim, were we to preclude plaintiff's counsel from challenging the testimony of defendants' only outside expert, we would unduly handicap plaintiff's case. Plaintiff's counsel is entitled to rebut the statements made by defense counsel in his summation, which attacked the testimony of plaintiff's experts and claimed that defendants are the most qualified experts in this matter. However, in light of counsel's prior statement to the motion judge that he "believe[s] [Dr. Hochberg] is competent to testify and cover the defendant's [sic] case" and that the testimony of the additional three experts would be cumulative of that of Dr. Hochberg, we disapprove of that portion of counsel's summation in which counsel directly stated that Dr. Hochberg "is clearly not qualified to give opinions in this case."

## IV.

Accordingly, we reverse the judgment of the Appellate Division, reinstate the trial court's order granting a mistrial, and remand the matter for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

In this appeal in a medical malpractice case, the majority first explains that, "[a]pplying an abuse of discretion standard to the

trial court's decision to bar defendants' requested amendments to their interrogatory answers and deny a further discovery extension[,] we find that defendants failed to show 'due diligence,' *Rule* 4:17–7, or 'exceptional circumstances,' *Rule* 4:24–1(c)." *Ante*, 187 *N.J.* 428, 901 *A.*2d 917 (2006) (citations omitted). The majority then concludes that there is "no reason to upset the trial court's exercise of discretion." *Ante*, 187 *N.J.* 428, 901 *A.*2d 917 (2006). Because the discovery quandary in which defendants found themselves was entirely of their own making, I concur. However, to the extent the majority concludes that "counsel's comment asking the jury to draw an adverse inference from defendants' failure to call any independent cardiologists necessitates a new trial," *ante*, 187 *N.J.* 433, 901 *A.*2d 919 (2006), I respectfully dissent.

According to the majority, plaintiff's rhetorical question in summation asking "[w]here are the outside independent experts in cardiology" was error because it "implied an untruth." *Ante*, 187 *N.J.* 433–36, 901 *A.*2d 919–22 (2006). That "untruth" is that defendants did have experts in cardiology who were barred from testifying. That bar was entirely of defendants' own making: those expert witnesses were barred because defendants unreasonably and without justification delayed providing their expert reports in discovery, a point on which both the majority and I agree. However, the majority and I disagree on whether plaintiff was entitled to focus on defendants' failure of proof resulting from the proper exclusion of defendants' proposed experts. In the majority's view, counsel in summation must hew to some metaphysical standard of truth, regardless of the state of the record before the fact finder. That standard ignores, and does grave violence to, the basic tenets of our adversary system.

We have repeatedly stressed that the latitude counsel is allowed in summation necessarily is circumscribed by the evidence admitted in the case. We have made clear that "[t]he scope of ... summation argument must not exceed the 'four corners of the evidence' " and that "[t]he 'four corners' include the evidence and all reasonable inferences drawn therefrom." *State v. Loftin*, 146

*N.J.* 295, 347, 680 *A*.2d 677 (1996) (citations omitted). We have also made patent that "[a] trial court must exclude from summation those arguments that the evidence does not reasonably support." *State v. Reddish,* 181 *N.J.* 553, 629, 859 *A*.2d 1173 (2004) (citation omitted). There is a salutary reason for this rule: by limiting the universe of what can be discussed in summation to the evidence properly before the tribunal, the propriety of a summation can be readily gauged and litigants are on fair notice of what is fair game and what is prohibited. Thus, the boundaries of proper summation are, and must remain, the evidence properly placed before the fact finder. Any rule that seeks to define the scope of summation differently is both practically unworkable and theoretically unsound.

Yet, that is the very exception the majority crafts. According to the majority, plaintiff was barred from exploiting in summation a procedural advantage even the majority concedes was fairly fought and won. Instead, the majority takes back with one hand what it gives with the other, denying defendants the opportunity to present independent cardiology experts because their disclosure was untimely but prohibiting plaintiff from commenting on their absence.

If our adversary system is to function well, and function well it must, it cannot be as arbitrary as the majority would have it. The rule, to date, has been straightforward: litigants are entitled to argue in summation based on the evidence properly presented to the fact finder, together with all reasonable inferences therefrom. That leeway must perforce include the ability to argue the absence of proofs by a party. That, in a nutshell, is all plaintiff did here: she argued the self-evident fact that defendants did not present any independent cardiologists when, in truth and in fact, defendants did not present any independent cardiologists.

The problem with the majority's reasoning does not end with its impracticality. It is also theoretically unsound. In this case, the majority condemns a summation comment concerning a party's failure of proof because that failure itself was caused by the

party's failure to abide by the discovery rules and several court orders. What comes next? If a party is unable to present an expert witness because the party is unable to pay for one, is the adversary barred from arguing a failure of proof? Under the majority's construct, the adversary would know that the failure of proof was occasioned by insufficient funds, and not the unavailability of an expert. Yet, to remain logically consistent, the majority would have to bar any comment in summation in this example also. That is going too far.

Because the summation by plaintiff's counsel was, in my view, entirely proper based on the evidence before the fact finder, I would affirm the judgment of the Appellate Division in all respects and I would reinstate the judgment in favor of plaintiff.

I respectfully dissent.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part/dissent in part*—Justice RIVERA-SOTO—1.