**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3039-18T3

HEATHER TRELLA and
MATTHEW TRELLA,
her husband,

     Plaintiffs-Respondents,

v.

GLEN E. BRADISH, M.D., and
ANDOVER ORTHOPEDICS,

     Defendants,

and

ALISON NEWPORT, R.N., and
NEWTON MEDICAL CENTER,

     Defendants-Appellants.

_____

         Argued September 17, 2019 – Decided October 8, 2019

         Before Judges Yannotti and Hoffman.

         On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Docket No. L-0268-17.

Peter A. Marra argued the cause for appellants AHS Hospital Corp, Newton Medical Center and Alison Newport, R.N. (Schenck, Price, Smith & King, LLP, attorneys; Peter A. Marra, of counsel and on the briefs; Julie E. Gendel, on the briefs).

Ernest P. Fronzuto argued the cause for respondents (Fronzuto Law Group, attorneys; Ernest P. Fronzuto, of counsel and on the brief; Casey Anne Cordes, on the brief).

PER CURIAM

By leave granted, defendants Newton Medical Center (NMC) and Alison Newport, R.N., appeal from an order entered by the Law Division on January 25, 2019, which required NMC to comply with an order entered by the court on September 28, 2018.[1]  The prior order required NMC to provide plaintiffs with a written narrative identifying where in plaintiff Heather Trella's medical chart any "adverse incident" pertaining to her treatment is documented.

On appeal, NMC argues that: (1) it has not identified any "adverse incidents" in Ms. Trella's medical chart and therefore it is unable to provide the narrative ordered; (2) the Root Cause Analysis (RCA) it performed concerning Ms. Trella's treatment is absolutely privileged under the Patient Safety Act (PSA), N.J.S.A. 26:2H-12.23 to -12.25c, and (3) the trial court erred by

---

[1]  In this opinion, we refer to appellants collectively as "NMC."

requiring a narrative because the patient's medical chart is "manageable." For the reasons that follow, we reject these arguments and affirm.

I.

We begin our consideration of NMC's appeal with a brief summary of the PSA, regulations adopted by the Department of Health (DOH) to implement the PSA, and the Supreme Court's decision in Brugaletta v. Garcia, 234 N.J. 231 (2018), which the trial court relied upon as authority for its order.

The PSA generally requires health care facilities to establish patient safety committees (PSCs), comprised of persons of "various disciplines" with "appropriate competencies," to evaluate patient care and safety practices. N.J.S.A. 26:2H-12.25(b)(2). The PSA also created a privilege against disclosure of documents, materials, or information developed by the health care facility as part of the process of self-critical analysis of so-called preventable events, near-misses, adverse events, and serious preventable adverse events (SPAEs). N.J.S.A. 26:2H-12.25(g).

The PSA defines a "preventable event" as "an event that could have been anticipated and prepared against, but occurs because of an error or other system failure." N.J.S.A. 26:2H-12.25(a). A "near miss" is defined in the PSA as "an occurrence that could have resulted in an adverse event but the adverse event was prevented." Ibid. The PSA defines an "adverse event" as "an event that is a negative

consequence of care that results in unintended injury or illness, which may or may not have been preventable." Ibid. And, a SPAE is defined as "an adverse event that is a preventable event and results in death or loss of a body part or disability or loss of bodily function lasting more than seven days or still present at the time of discharge from a health care facility." Ibid.

The PSA provides that if a health care facility or one of its employees suspects that a SPAE has occurred, and the PSC is so informed, the PSC must perform a RCA to identify the cause of the SPAE. N.J.A.C. 8:43E-10.3; N.J.A.C. 8:43E-10.4(d)(7). The PSC must report the SPAE to the DOH. N.J.S.A. 26:2H-12.25(c); N.J.A.C. 8:43E-10.4)(d)(5). Among other things, the PSC's report to the DOH must state the nature of the event, how it was discovered, and the corrective actions that have been taken. N.J.A.C. 8:43E-10.6(c). The health care facility also must inform the affected patient of the SPAE. N.J.S.A. 26:2H-12.25(d); N.J.A.C. 8:43E-10.7(a)(1).

The PSA further provides that any documents, materials, or information that the DOH receives concerning a SPAE, near-miss, preventable event, or adverse event shall not be "subject to discovery or admissible as evidence or otherwise disclosed in any civil, criminal, or administrative action or proceeding." N.J.S.A. 26:2H-12.25(f)(1). The same privilege applies to documents, materials, or information developed by a health care facility as part of a self-critical analysis,

which was undertaken in the manner prescribed by N.J.S.A. 26:2H-12.25(b), concerning a preventable event, near-miss, adverse event, or SPAE.  N.J.S.A. 26:2H-12.25(g)(1).

Notably, regulations adopted by the DOH limit the privilege under N.J.S.A. 26:2H-12.25(g)(1).  C.A. v. ex rel. Applegard v. Bentolila, 219 N.J. 449, 468 (2014).  N.J.A.C. 8:43E-10.9(b) states that the privilege will not attach unless the documents, materials, or information at issue were developed "exclusively" during the process of self-critical analysis conducted in accordance with N.J.A.C. 8:43E-10.4, 10.5, or 10.6.

II.

In Brugaletta v. Garcia, 234 N.J. 231 (2018), the Supreme Court addressed the privilege of self-critical analysis established by the PSA.  In Brugaletta, the plaintiff presented to a hospital with a fever accompanied by abdominal and other pains.  Ibid.  A scan revealed that the plaintiff had a pelvic abscess due to a perforated appendix.  Ibid.  The plaintiff's doctors drained the abscess.  Ibid.  Thereafter, the plaintiff's fever abated and her abdominal pain lessened; however, she complained of worsening pain in her legs.  Ibid.

Further tests revealed the plaintiff had developed a bacterial infection in her thigh muscles and right buttock because abscess drainage was leaking around a

A-3039-18T3

nerve. Id. at 232. The plaintiff underwent various surgical procedures and her abdominal pain resolved, but she had certain residual pain and permanent injuries. Ibid. The plaintiff filed a medical malpractice action in which she alleged the doctors who performed the medical tests and provided treatment failed to detect a second abscess. Ibid.

In discovery, the plaintiff sought disclosure from the hospital of any statement made by any person regarding her lawsuit. Id. at 233. The hospital responded to this discovery request by stating that two reports had been prepared concerning the plaintiff's treatment, but were protected from disclosure by the privilege of self-critical analysis and the PSA. Ibid.

The plaintiff filed a motion to compel discovery of the names of the persons who reviewed her treatment, and to require the hospital to submit the undisclosed reports to the trial court for in camera review. Id. at 234. The trial court reviewed the reports and found that the plaintiff suffered a SPAE, which the hospital erroneously failed to report to the DOH, but the error was not an arbitrary and capricious act. Id. at 234-35. The court ordered the hospital to release a redacted version of one of the reports. Id. at 235.

The Supreme Court held that the trial court had the authority to review the reports in camera to determine if the hospital had validly invoked the privilege of

self-critical analysis. Id. at 245. The Court held, however, that the trial court "erred in passing judgment" on the hospital's SPAE determination because under the PSA, the court has no role in reviewing a health care facility's SPAE determination. Id. at 246-47.

The Court also held that the trial court erred by ordering disclosure of a redacted version of the report because the relevant provisions of the PSA show that the Legislature intended "to encase the entire self-critical-analysis process in a privilege, shielding a health care facility's deliberations and determinations from discovery or admission into evidence." Id. at 247. The Court stated that, if the hospital complies with the procedures prescribed by the PSA, the privilege "unconditionally protects the process of self-critical analysis, the analysis's results, and the resulting reports developed by a facility in its compliance with the PSA." Ibid.

The Court noted, however, that the privileges established by the PSA "do not bar the discovery or admission into evidence of information that [is otherwise] discoverable or admissible." Id. at 244. The Court stated that even though certain documents, materials, or information may have been developed in reporting a SPAE to the DOH, or in the process of self-critical analysis, they "may nevertheless be discoverable and admissible if [they are] obtainable from any other source or in 'any

 A-3039-18T3

context other than those specified' in the PSA." Ibid. (quoting N.J.S.A. 26:2H-12.25(h)).

The Court noted that N.J.A.C. 8:43G-15.2(e) requires a health care facility to include "[a]ny adverse incident" concerning the patient's care in the patient's medical records, and a patient is entitled to "prompt access to" and a copy of that medical record. Id. at 251 (citing N.J.A.C. 8:43G-4.1(a)(24), (25)). The Court stated "it was apparent" the plaintiff had experienced an "adverse incident," as defined in the PSA and the regulations, and "[the] raw factual information" concerning the plaintiff's treatment was documented in the medical records before the hospital began the process of self-critical analysis. Ibid.

The Court also noted that although the report of the hospital's self-critical analysis, even in redacted form, was not subject to disclosure, the defendants had not objected to production of the "raw underlying factual data" pertaining to the plaintiff's treatment, but it was "buried within mounds of [the] plaintiff's patient records." Id. at 251-52. The Court observed that in their effort to convince the trial court they had informed the plaintiff of the non-privileged facts about her care, the defendants had provided "a concise step-by-step narrative, walking the court through the relevant excerpts of [the] plaintiff's patient records." Id. at 252.

The Court held that in order to effectuate the release of "purely factual information" about a patient's treatment, "while simultaneously protecting [the] deliberative material" related to the hospital's self-critical analysis, the trial court "should have used its common law power, in administering the discovery rules, [and ordered the] defendants to provide [the] plaintiff [with] a narrative similar in form to the one they presented [to] the court." Ibid.

The Court stated that the plaintiff was entitled to the "raw data contained in her patient records." Ibid. The Court added that "mandating a narrative to steer [the plaintiff] to that information would have required [the] defendants to identify, as they should have, an adverse incident to [the] plaintiff, . . . in language she could understand." Ibid. (citing N.J.A.C. 8:43G-15.2(e); N.J.S.A. 26:2H-12.8(c)).

III.

Here, the record shows that on January 6, 2016, Ms. Trella presented to NMC with certain medical complaints, which included pain to her right leg. Ms. Trella was seen by Glen E. Bradish, M.D., who found that she had a severely comminuted right femoral shaft fracture. Ms. Trella underwent orthopedic surgery, after which she complained of numbness, coldness, decreased sensation, and a lack of mobility to her right leg. She was transferred to Morristown Medical Center, where she later

underwent a below-the-knee right-leg amputation, which was allegedly due to a vascular occlusion.

On June 6, 2017, Ms. Trella and her spouse, Matthew Trella, filed this medical malpractice action against Dr. Bradish, Andover Orthopedics, NMC, and Newport. In discovery, plaintiffs requested answers to the Form C Interrogatories, one of which asked defendants to

> [s]tate (a) the name and address of any person who has made a statement regarding this lawsuit; (b) whether the statement was oral or in writing; (c) the date the statement was made; (d) the name and address of the person to whom the statement was made; (e) the name and address of each person present when the statement was made; and (f) the name and address of each person who has knowledge of the statement.

In its response to this interrogatory, NMC asserted that the information sought was privileged and protected from disclosure on various grounds, including the privilege of self-critical analysis. NMC stated, however, without waiving any objection, that a RCA had been performed concerning Ms. Trella's treatment, but the RCA was confidential. On December 28, 2017, plaintiffs served NMC with a request for a further response to the interrogatories. NMC responded by stating that "[t]his event was not considered a [SPAE]." NMC acknowledged, however, "[t]his event was considered an adverse event."

 A-3039-18T3

Thereafter, plaintiffs filed a motion to compel NMC to provide more specific answers to the interrogatories. Plaintiffs sought: (1) a detailed privilege log of all materials that NMC claims are privileged; (2) a list of the members of NMC's Preventive Event Review Committee (PERC) and their specialties; (3) a copy of NMC's patient safety plan (PSP); (4) factual proofs establishing that the documents at issue were developed exclusively during self-critical analysis conducted during the operations of the PERC; (5) the names of all individuals, who were interviewed as part of the RCA, and who have knowledge of facts and information concerning Ms. Trella's treatment; and (6) a list of all of Ms. Trella's medical records that were reviewed as part of the RCA that NMC performed.

NMC opposed the motion and filed a cross-motion for a protective order. NMC also provided plaintiffs with a privilege log, which identified a January 22, 2016 RCA that the PERC had prepared.

On April 2, 2018, the trial court ruled on the parties' motions. The court granted plaintiffs' motion in part and required NMC to provide a copy of the PSP and a privilege log for "any additional materials separate from the [RCA] that [NMC] claim[s] [is] privileged." The court denied without prejudice the other relief plaintiffs sought, and NMC's motion for a protective order.

On July 25, 2018, the Supreme Court issued its opinion in Bruguletta. Thereafter, plaintiffs filed a motion for reconsideration of the April 2, 2018 order in light of Brugaletta. Plaintiffs asked the court to order NMC to provide a "narrative identifying the nature and description of the adverse incident experienced by [Ms. Trella] and specifically as to where in [her] medical chart the information is contained." Plaintiffs also sought additional information regarding the RCA, including the identities of all the individuals who participated in the RCA. In addition, plaintiffs asked the court to require NMC to provide the privileged RCA documents to the court for in camera review.

On September 28, 2018, the court entered an order, which required NMC to provide within thirty days a "narrative that specifies" where documentation of any "adverse incident" may be found in Ms. Trella's medical records. The order also required NMC to furnish an updated privilege log. The court denied plaintiffs' request for disclosure of the names of the persons who participated in the RCA.

On October 25, 2018, NMC sent plaintiffs a letter, which referred plaintiffs to "the patient's records from [NMC]." The letter stated that NMC had not made a determination as what may or may not constitute an "adverse incident" within Ms. Trella's medical records. The NMC also stated that all of the "information contained in the [RCA] is confidential and privileged pursuant to the [PSA]."

A-3039-18T3

By letter dated November 2, 2018, plaintiffs informed NMC that its response did not comply with the court's order. Plaintiffs gave NMC an additional seven days in which to comply. NMC did not provide the narrative.

On December 5, 2018, plaintiffs filed a motion to enforce the September 28, 2018 order, and asked the court to sanction NMC for failing to comply. On January 25, 2019, the judge denied plaintiffs' application for sanctions, but ordered NMC to comply with the September 28, 2018 order.

In his decision, the judge noted that N.J.A.C. 8:43G-15.2 requires health care providers to document "any adverse incident including patient injuries . . . in the patient's medical records." The judge commented that this is what Brugaletta requires and what he had ordered. The judge stated that the NMC can protect the confidentiality of the RCA, while also identifying the "adverse incidents" documented in Ms. Trella's medical chart. The judge rejected NMC's contention that Brugaletta only applies to patients with voluminous medical records.

The judge entered an order dated January 25, 2019, which required NMC to comply with the September 25, 2018 order within twenty-five days. We thereafter granted NMC's motion for leave to appeal and stayed the order pending appeal.

IV.

As noted, NMC argues that the trial court erred by ordering it to provide a narrative identifying where in Ms. Trella's medical records any "adverse incident" regarding her treatment is documented.

When reviewing a trial court's decision in matters pertaining to discovery, we apply an abuse of discretion standard.  Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011) (citing Bender v. Adelson, 187 N.J. 411, 428 (2006)).  We will defer to the trial court's disposition of discovery matters "unless the court abused its discretion or its determination is based on a mistaken understanding of the law." Ibid. (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005)).

On appeal, NMC argues that it has never identified any "adverse incidents" in Ms. Trella's medical records, and asserts that it is "unsure" how it could possibly identify such incidents "should any exist."  NMC acknowledges that if a health care provider determines there has been an "adverse incident" in a patient's treatment, the incident must be recorded contemporaneously in a patient's medical chart.

NMC asserts that in its order, the trial court did not specify the person or persons at NMC who should be responsible for reviewing the chart entries.  NMC claims "dozens of medical providers" made the entries.  NMC asserts that the court

provided no guidance as to the person or persons who should identify and interpret the entries that might constitute an "adverse incident."

We are not persuaded by NMC's contentions. As the Court stated in Brugaletta, a health care facility is required to document "[a]ny adverse incident" in a patient's medical records. Id. at 251 (citing N.J.A.C. 8:43G-15.2(e)). The Court noted that the DOH's regulations do not define the term "adverse incident," but stated that "adverse" generally means something "detrimental or unfavorable," and "incident" means an "occurrence" or "separate unit of experience." Id. at 251, n. 9 (quoting Webster's New Int'l Dictionary 31, 1142 (3d ed. 1981)).

Thus, NMC and its providers should have identified any "adverse incidents" related to Ms. Trella's treatment, when the treatment was provided. NMC claims that because no "adverse incidents" were recorded when Ms. Trella was treated, the task now would be "overly burdensome." The record does not, however, support that claim. Moreover, NMC has conceded that an "adverse event" of some kind occurred during Ms. Trella's treatment. NMC has not convincingly explained why that event would not meet the definition of an "adverse incident."

NMC also argues that the trial court erred by failing to identify the person or persons at NMC who should review Ms. Trella's chart entries and identify the "adverse incidents" that were recorded there or should have been recorded. The trial

A-3039-18T3

court stated that it is NMC's responsibility to identify the person or persons who should perform that task. We agree.

NMC further argues that the trial court erred by applying <u>Brugaletta</u> to this case. NMC asserts that in <u>Brugaletta</u>, the factual data concerning the plaintiff's treatment was contained in 4500 pages of records, whereas Ms. Trella's chart only consists of 310 pages. <u>Id.</u> at 257. NMC argues that a narrative of the sort described in <u>Brugaletta</u> should only be required when a patient has a "voluminous chart." NMC also contends plaintiffs' request for the narrative is an effort to circumvent the privilege under the PSA.

We are convinced, however, that the trial court's order is entirely consistent with <u>Brugaletta</u>. As we stated previously, in <u>Brugaletta</u>, the Court noted that a health care facility is required to record any "adverse incidents" in a patient's medical records, and the patient is entitled to obtain that information. <u>Brugaletta</u>, 234 N.J. at 251-52. The Court explained that in the exercise of its authority to enforce the discovery rules, the trial court may order a health care provider to produce a narrative identifying where in the medical records the information may be found. <u>Id.</u> at 252. The Court's analysis applies to <u>any</u> patient's medical records, not simply patients whose medical records are voluminous.

NMC also contends the RCA it performed regarding Ms. Trella's treatment is absolutely privileged under the PSA, and plaintiffs' request for the narrative is an effort to circumvent the privilege. The trial court did not, however, order NMC to produce the RCA or any documents, materials, or information developed in the process of self-critical analysis.

Furthermore, as the Brugaletta Court noted, the PSA does not "immunize from discovery information that would be otherwise discoverable." Id. at 250 (citing N.J.S.A. 26:2H-12.25(h)). Ms. Trella is entitled to discovery of the data recorded in her medical records, including any "adverse incidents" that were or should have been documented. The trial court did not abuse its discretion by ordering NMC to provide plaintiffs with the narrative identifying where in Ms. Trella's chart the "adverse incidents" are documented.

Accordingly, the trial court's order of January 25, 2019, is affirmed, and the stay of that order which we previously entered is vacated. The matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3039-18T3