973 A.2d 993

MELISSA TYNES, BY HER NATURAL PARENT AND GUARDIAN AD LITEM, BRENDA HARRIS, AND BRENDA HARRIS, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. ST. PETER'S UNIVERSITY MEDICAL CENTER, BELINDA CARTER, ALISIA D. MONTEIRO, SANDY WILKINS, DR. MICHAEL CARSON, DR. KIMBERLY DIXON, AND DR. HILLEL COHEN, DEFENDANTS–RESPONDENTS, AND BAXTER HEALTHCARE CORPORATION, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued May 27, 2009—Decided July 14, 2009.

Before Judges WEFING, YANNOTTI and LeWINN.

*Anthony Cocca* argued the cause for appellants (*Bubb, Grogan & Cocca, L.L.P.*, attorneys; *Mr. Cocca*, of counsel; *Kristi L. Terranova*, on the briefs).

*Sharon K. Galpern* argued the cause for respondent *Alisia D. Monteiro* (*Stahl & DeLaurentis, P.C.*, attorneys; *Ms. Galpern*, on the brief).

*John M. Walsh* argued the cause for respondents St. Peter's University Medical Center, Belinda Carter, Alisia D. Monteiro and Sandy Wilkins (*Amdur, Maggs & Shor, P.C.*, attorneys, join in the brief of respondent Alisia D. Monteiro ).

*George H. Cortelyou* argued the cause for respondents Dr. Kimberly Dixon and Dr. Hillel Cohen (*Buckley & Theroux, L.L.C.*, attorneys; *Sean P. Buckley,* of counsel; *Mr. Cortelyou,* on the brief).

*Olga Kats–Chalfant* argued the cause for respondent Dr. Michael Carson (*Giblin & Combs,* attorneys; *Ms. Kats–Chalfant,* on the brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

Plaintiffs appeal from orders entered by the trial court on April 25, 2008, denying plaintiffs' motion to extend the time for discovery and granting summary judgment in favor of defendants. Plaintiffs also appeal from an order entered on June 20, 2008, denying their motion for reconsideration. For the reasons that follow, we affirm.

## I.

This appeal arises from the following facts. On April 1, 2002, plaintiff Melissa Tynes ("Melissa") sought treatment at the emergency room of St. Peter's University Medical Center ("St. Peter's") due to an acute sickle cell crisis, and was thereafter admitted to the hospital. Melissa was eighteen years old at the time, and she had a history of sickle chest syndrome. On April 2, 2002, Melissa came under the care of defendants Dr. Michael Carson ("Carson"), and certain resident doctors, including Kim Dixon ("Dixon") and Hillel Cohen ("Cohen").[1] As part of her treatment, Melissa was placed on a patient controlled analgesia ("PCA") pump that was used to administer morphine.

On April 3, 2002, Carson, Dixon and another resident doctor increased the dosage of morphine. They also began blood transfu-

---

[1] We note that Cohen's involvement with Melissa's care began and ended on April 2, 2002.

sions to decrease the amount of hemoglobin. On April 4, 2002, at about 10:00 a.m., Carson and his team saw Melissa. Carson wrote in his chart that Melissa was tired but "arousable." Carson noted that Melissa's breathing was coarse throughout both of her lung fields. Carson noted that Melissa was experiencing "volume overload," pulmonary reactions to the blood transfusions and possible sickle chest syndrome. He also noted that Melissa was coughing and showing signs of a possible viral syndrome.

Later that day, at approximately 1:45 p.m., Dixon found Melissa lethargic with bilious material coming from her mouth. Melissa's father, Robert Tynes ("Tynes"), was present at the time. He allegedly told Dixon that he had activated Melissa's PCA pump, believing it to be the nurse's call button. Melissa experienced severe aspiration pneumonitis. She was "intubated" and transferred to the intensive care unit. She remained on a ventilator and was later transferred to another hospital. Melissa allegedly suffered permanent brain injuries as a result of the treatment she received at St. Peter's.

On October 10, 2003, Melissa's mother, Brenda Harris ("Harris"), filed an action against St. Peter's and Tynes individually and on behalf of Melissa. Plaintiffs alleged that Tynes had negligently activated the PCA pump causing Melissa to suffer an overdose of morphine. Plaintiffs further alleged that St. Peter's and its medical and nursing staff were negligent in failing to adequately monitor Melissa's condition.

On July 1, 2004, plaintiffs filed their first amended complaint, which added Baxter Healthcare Corporation ("Baxter") as a defendant. According to the complaint, Baxter designed, manufactured and distributed the PCA pump used to administer the morphine to Melissa. Plaintiffs alleged that the PCA pump was not suitable and safe for its intended purpose.

On September 1, 2004, plaintiffs filed their second amended complaint, which added St. Peter's nurses Belinda Carter ("Carter"), Alisia D. Monteiro ("Monteiro") and Sandy Wilkins ("Wilkins") as defendants. Plaintiffs alleged that Carter, Monteiro and

Wilkins "were responsible for calibrating and setting up the PCA used in connection with" Melissa's care.

Thereafter, Carson provided St. Peter's counsel with a letter dated September 14, 2004. In his letter, Carson noted that he had been asked to review Melissa's chart and respond to questions regarding Melissa's care, specifically the dosing of morphine, the cause of Melissa's decompensation and the level of morphine administered to her.

Carson stated that the dose of morphine prescribed prior to Melissa's decompensation was "clinically appropriate." Carson said that there was nothing to indicate that the PCA pump was not calibrated and functioning appropriately. He added that, "it is impossible to say if the cause of her decompensation was the morphine [Melissa] received as a result of her father hitting the button or if it was simply a progression of the underlying lung process that we detected at 10[:00 a.m.]."

Carson also stated that the morphine had been prescribed to deal with Melissa's pain. He wrote that Melissa had presented with a "sickle crisis" and that Melissa believed that she required more medication to control her pain. Carson stated that the PCA dose was "adjusted quickly and . . . appropriately."

Carson was deposed on November 24, 2004. He testified that, although his notes were "somewhat definitive," after he had reviewed the chart and looked at the timeline of Melissa's care, the reasons for her decompensation had become less clear to him.

Carson stated that the PCA pump had a six-minute lockout and therefore Melissa would have only received a dose of morphine every six minutes. He said that he was no longer certain that Melissa's decompensation was due to "morphine dosing." Carson raised the possibility that Melissa's condition was due to an inadvertent "volume overload" caused by the intravenous fluids and blood transfusions.

On August 25, 2005, with leave of the trial court, plaintiffs filed a third amended complaint, in which they added Carson, Dixon

and Cohen as defendants. Plaintiffs dropped their claims against Tynes.

On September 7, 2005, the court entered a case management order establishing a March 31, 2006 discovery end date. On March 29, 2006, the court entered another case management order, which extended the time for discovery to October 31, 2006. Another case management order was entered on June 8, 2006, which required the parties to provide answers to interrogatories and responses to the notices to produce documents. The June 8, 2006 order also established dates for depositions of fact witnesses and parties, which were to be completed by August 11, 2006. The court entered another case management order on August 17, 2006. The order required, among other things, that Carson's re-deposition be completed by October 31, 2006, and that plaintiffs serve their expert reports by December 29, 2006.

On October 30, 2006, Carson filed a motion for summary judgment, arguing that the claims against him should be dismissed because they were asserted after the time prescribed by the applicable statute of limitations. On November 3, 2006, Dixon and Cohen filed a motion for summary judgment on the same ground. The trial court entered an order on February 22, 2007, denying the motions.

Thereafter, Carson, Dixon and Cohen filed motions for reconsideration. The trial court entered orders on April 10, 2007, denying the motions. The court also denied Carson's motion to stay further proceedings in the case pending an interlocutory appeal. On June 25, 2007, we denied motions by Carson, Dixon and Cohen for leave to appeal. It appears that, despite the order denying a stay of proceedings, discovery essentially came to a halt as Carson, Dixon and Cohen endeavored to obtain interlocutory appellate review of the orders denying their motions for summary judgment.

On August 28, 2007, Dixon and Cohen filed a joint motion to extend the time for discovery for an additional 180 days. The court entered an order dated October 14, 2007, granting the

motion and establishing a new discovery end date of April 14, 2008. The order provided that remaining depositions of fact witnesses must be completed within sixty days; plaintiffs' expert reports served within forty-five days of the date of the last deposition; defendants' expert reports served within thirty days thereafter, with depositions of the experts to follow.

In addition, the court stamped on the order the following statement:

> FURTHER ORDERED that no further extensions to the discovery end date will be granted without a showing of exceptional and heretofore unforeseen circumstances.

Carson was re-deposed on January 14, 2008. At that deposition, Carson testified that he had consulted with hematologist Dr. Beatriz Lega ("Lega") regarding Melissa's care. He stated that his consultation with Lega included input regarding pain management as well as other evaluations and treatments.

On February 4, 2008, plaintiffs' investigator served a subpoena upon St. Peter's, where Lega had been employed. The subpoena scheduled the deposition for February 27, 2008. St. Peter's informed plaintiffs' counsel that Lega had retired and refused to provide counsel with Lega's last known address. Plaintiffs' counsel ascertained Lega's address and, on April 17, 2008, served a subpoena upon her, scheduling a deposition for May 19, 2008. Plaintiffs' counsel elected not to serve any expert reports until he had an opportunity to depose Lega.

In March 2008, Carson, Dixon, Cohen, St. Peter's, Carter, Monteiro and Wilkins filed motions for summary judgment because plaintiff had not served expert reports within the time required by the trial court's October 14, 2007 order. Plaintiffs opposed the motions and filed a cross-motion to extend the time for discovery. Plaintiffs argued that they could not furnish their expert reports until Lega had been deposed. They further argued that, although they were aware that Lega had been consulted regarding Melissa's care, they were not aware of her involvement

with the PCA pump until Carson was re-deposed on January 14, 2008.

The trial court considered the motions on April 25, 2008, and, after hearing argument, placed its decision on the record. The court determined that plaintiffs had not established "exceptional and heretofore unforeseen circumstances" for a further discovery extension, as required by the October 14, 2007 case management order. The court found that plaintiffs knew of Lega's involvement in Melissa's treatment well before Carson's re-deposition on January 14, 2008. The court further found that plaintiffs' attorney had more than enough time to complete discovery and serve the expert reports and a further extension of the time for discovery was not justified.

The court additionally determined that, because plaintiffs had not served expert reports prior to the discovery end date, Carson, Dixon, Cohen, St. Peter's, Carter, Monteiro and Wilkins were entitled to summary judgment. Apparently with plaintiffs' agreement, the court also applied this determination to Baxter, although Baxter had not filed a formal motion for summary judgment.

The court entered orders dated April 25, 2008, denying plaintiffs' motion to extend the time for discovery and granting summary judgment in favor of all defendants. On May 15, 2008, plaintiffs filed a motion for reconsideration. The trial court entered an order dated June 20, 2008, denying the motion. This appeal followed. We note that, in their appeal, plaintiffs are not challenging the dismissal of their claims against Baxter.

## II.

Plaintiffs first argue that, in ruling upon their motion for an extension of time for discovery, the trial court erred by requiring them to show that the extension was needed due to "exceptional and heretofore unforeseen circumstances." As we stated previously, the court's October 14, 2007 order extending the time for discovery established a discovery end date of April 14, 2007. The order did not, however, establish an arbitration or trial date.

Extensions of time for discovery in civil actions are governed by *Rule* 4:24–1. *Rule* 4:24–1(a) establishes the time within which discovery is to be completed in cases designated as either Track I, II, III or IV matters. The rule provides that the time for discovery in Track I cases is 150 days; in Track II cases, 300 days; and, in Track III and IV cases, 450 days, "except as otherwise provided by [*Rule*] 4:69–4[.]" Medical malpractice actions are assigned to Track III. *See R.* 4:5A–1; Civil Case Information Statement, Pressler, *Current N.J. Court Rules,* Appendix XII–B1 to *R.* 4:5–1 (2009).

*Rule* 4:24–1(a) further provides that the time for discovery runs from the filing of the first answer of the originally named parties, or ninety days after the first defendant is served, whichever first occurs. *Rule* 4:24–1(b) allows discovery to be extended for an additional sixty-day period when a pleading is filed that joins another party to the action, unless the time is "reduced or enlarged by the court for good cause shown."

Further extensions of time for discovery are governed by *Rule* 4:24–1(c), which states in pertinent part that:

[t]he parties may consent to extend the time for discovery for an additional [sixty] days by stipulation filed prior to the expiration of the discovery period. If the parties do not agree or a longer extension is sought, a motion for relief shall be filed with the Civil Presiding Judge or designee in Track I, II, and III cases and with the designated managing judge in Track IV cases, and made returnable prior to the conclusion of the applicable discovery period.... On restoration of a pleading dismissed pursuant to [*Rule*] 1:13–7 or [*Rule*] 4:23–5(a)(1) or if good cause is otherwise shown, the court shall enter an order extending discovery and specifying the date by which discovery shall be completed. The extension order may describe the discovery to be completed and such other terms and conditions as may be appropriate. No extension of the discovery period may be permitted after an arbitration or trial date is fixed, unless exceptional circumstances are shown.

 The provisions of *Rule* 4:24–1(c) are clear and unambiguous. The "good cause" standard applies to motions to extend discovery unless an arbitration or trial date is fixed. *Leitner v. Toms River Reg'l Schs.,* 392 *N.J.Super.* 80, 91–92, 919 *A.*2d 899 (App.Div.2007); *Ponden v. Ponden,* 374 *N.J.Super.* 1, 8–10, 863 *A.*2d 366 (App.Div.2004), *certif. denied,* 183 *N.J.* 212, 871 *A.*2d 90 (2005). Therefore, the rule does not permit a trial court to require

a party to establish "exceptional or heretofore unforeseen circumstances" for a discovery extension unless the court has previously fixed an arbitration or trial date.

Defendants argue, however, that in cases where the trial court has entered an order extending the time for discovery pursuant to *Rule* 4:24–1(c), the court may require a showing of "exceptional circumstances" for a further discovery extension by imposing that requirement as a term or condition in the order, even though the court has not established an arbitration or trial date. We disagree. Such a term or condition would be inconsistent with the plain language of *Rule* 4:24–1(c), which clearly provides that the "exceptional circumstances" standard only applies when the court has fixed an arbitration or trial date.

## III.

Plaintiffs next argue that the trial court abused its discretion by denying their motion because they established "good cause" to extend the time for discovery. We disagree.

■ "Good cause" under *Rule* 4:24–1(c) is a flexible term and "its meaning is not fixed and definite." *Leitner, supra,* 392 *N.J.Super.* at 87, 919 *A.*2d 899 (citing *Tholander v. Tholander,* 34 *N.J.Super.* 150, 152, 111 *A.*2d 643 (Ch.Div.1955)). "In deciding whether good cause has been shown for an extension of discovery in the absence of a fixed arbitration or trial date, there are a number of factors which a trial court should consider." *Ibid.* Those factors include:

(1) the movant's reasons for the requested extension of discovery;

(2) the movant's diligence in earlier pursuing discovery;

(3) the type and nature of the case, including any unique factual issues which may give rise to discovery problems;

(4) any prejudice which would inure to the individual movant if an extension is denied;

(5) whether granting the application would be consistent with the goals and aims of "Best Practices";

(6) the age of the case and whether an arbitration date or trial date has been established;

(7) the type and extent of discovery that remains to be completed;

(8) any prejudice which may inure to the non-moving party if an extension is granted; and

(9) what motions have been heard and decided by the court to date.

[*Id.* at 87–88, 919 *A.*2d 899.]

Under *Leitner*, we must first consider the reasons that plaintiffs offered for the requested discovery extension and whether plaintiffs were diligent in pursuing discovery earlier in the case. *Id.* at 87, 919 *A.*2d 899. Here, plaintiffs sought the discovery extension because they had not deposed Lega and their attorney chose for "strategic" reasons to withhold service of their expert reports until she had been deposed. We conclude, however, that plaintiffs did not present sound reasons for the discovery extension or their failure to pursue Lega's deposition and serve their expert reports prior to the discovery end date.

█ Plaintiffs maintain that they were not aware of Lega's involvement with Melissa's PCA pump until Carson's second deposition on January 14, 2008. The record shows, however, that plaintiffs were on notice of Lega's involvement with Melissa's care, including the PCA pump, long before Carson's second deposition.

Carson provided answers to the form interrogatories in February 2006. In his answers, Carson stated that he had consulted with a hematologist with regard to the management of Melissa's sickle cell crisis. With his answers to interrogatories, Carson also had provided plaintiffs with a transcription of the notes he had placed in Melissa's medical chart. In his notes, Carson specifically mentioned his consultation with Lega regarding Melissa's care.

In addition, Harris was deposed in December 2004. Harris stated that, after Melissa was admitted to St. Peter's, she went to the hospital to see her daughter. Harris testified that, while she was at the hospital, she spoke to a female hematologist, who evaluated Melissa and set up Melissa's PCA pump, but did not recall the doctor's name. We note that Harris is a physician.

Furthermore, in October 2006, counsel for Dixon and Cohen requested Melissa's authorization pursuant to *Stempler v. Spei-*

*dell,* 100 *N.J.* 368, 495 *A.*2d 857 (1985), so that they could interview Lega. Plaintiffs' attorney objected to the interview, but withdrew his objections after the court ordered him to do so. Although the interview never took place, Dixon's and Cohen's request for authorization to interview Lega is a further indication that plaintiffs and their attorney were on notice that Lega was a potential fact witness in this matter long before the April 14, 2008 discovery end date.

Plaintiffs' counsel did not, however, attempt to schedule Lega's deposition until after Carson's re-deposition in January 2008. Counsel says that he was unable to take the deposition before the discovery end date because he was engaged in successive trials, had certain medical problems, there were difficulties in serving Lega and Lega was unavailable at certain times. These may be legitimate reasons for counsel's failure to schedule the deposition after Carson's January 2008 deposition, but plaintiffs were on notice of Lega's involvement in Melissa's case as early as February 2006. Clearly, plaintiffs' counsel should have deposed Lega earlier in the case.

Plaintiffs also have not presented a convincing explanation as to why they could not produce their expert reports as to the alleged liability of the other defendants until after Lega had been deposed. Plaintiffs' counsel unilaterally elected not to comply with the trial court's October 14, 2007 order and chose not to serve the expert reports by the date required by the order for what are said to be "strategic" reasons. In our view, counsel's strategy does not justify his disregard of the court's order.

■ Under *Leitner,* the age of the case and the extent to which the discovery end date has been extended are also factors to be considered in determining whether plaintiffs have shown "good cause" for a discovery extension. *Leitner, supra,* 392 *N.J.Super.* at 87–88, 919 *A.*2d 899. As stated previously, this case has been pending since 2003, and the trial court had extended the time for discovery numerous times. This is a Track III case and the initial time for discovery in such a case is 450 days. *See R.* 4:24–1(a).

Here, the trial court had permitted 1,585 days for discovery. As the trial court correctly observed, that was more than enough time for plaintiffs to depose Lega and serve their expert reports.

We must also consider the discovery that remains to be completed in this case. *Leitner, supra,* 392 *N.J.Super.* at 88, 919 *A.*2d 899. In addition to Lega's deposition, plaintiffs must finalize and serve their expert reports. Thereafter, defendants must complete and serve their expert reports. In addition, the parties must be afforded the opportunity to depose the experts. Thus, more than a brief period of time would be required to complete the additional discovery.

In addition, we must consider the prejudice to the parties resulting from the grant or denial of the discovery extension. *Id.* at 87–88, 919 *A.*2d 899. Plaintiffs have been prejudiced by the denial of their application for a discovery extension because it resulted in the dismissal of their claims with prejudice. Because they were not afforded additional time for discovery, plaintiffs were not able to produce their expert reports. It is undisputed that, without those reports, plaintiffs could not proceed on their medical malpractice claims.

On the other hand, defendants would be prejudiced if a discovery extension is granted. The claims against defendants have been pending for several years and defendants have a strong interest in having this matter concluded. A further delay could compromise defendants' ability to defend against plaintiffs' claims. In this regard we note that, when depositions were taken in the case in 2004, memories of certain witnesses regarding the events of April 2002 had already begun to fade.

The absence of an arbitration or trial date is also a factor to be considered in determining whether plaintiffs established "good cause" for the discovery extension. *Id.* at 87, 919 *A.*2d 899. It is unclear why the court did not fix an arbitration or trial date at the time the court entered its October 14, 2007 case management order, particularly in view of the fact that the court anticipated that all discovery would be completed April 14, 2008. In any

event, the absence of an arbitration or trial date has less significance than it might otherwise have due to the age of this case and the amount of time the court had already permitted for discovery.

In determining whether plaintiffs established "good cause" under *Rule* 4:24–1(c), we must also consider whether granting the application would be consistent with "the goals and aims" of the "Best Practices" rule amendments. *See Leitner, supra,* 392 *N.J.Super.* at 87, 919 *A.*2d 899. The "Best Practices" rules were adopted in part to address the concerns that deadlines for discovery were "'rarely observed'" and "'attorneys [were] routinely granted extensions [with] no enforced discovery end date.'" *Bender v. Adelson,* 187 *N.J.* 411, 426, 901 *A.*2d 907 (2006) (quoting *Notices to the Bar: Report of the Conference of Civil Presiding Judges on Standardization and Best Practices,* 156 *N.J.L.J.* 80, 82 (April 5, 1999)).

The "Best Practices" rules lengthened the initial discovery periods and made "it substantially more difficult to obtain extensions and [provide] amendments [to discovery responses] once discovery has ended and a trial or arbitration date is set." *Ibid.* The "good cause" standard in *Rule* 4:24–1(c) is an essential part of "Best Practices" because it allows the trial courts to establish and enforce meaningful discovery end dates and ensures that discovery extensions will not be routinely granted, even in the absence of a fixed trial or arbitration date.

We are convinced that granting plaintiffs a discovery extension would not be consistent with "the goals and aims" of "Best Practices." If plaintiffs are deemed to have established "good cause" in this case, notwithstanding the length of time in which this matter has been pending, the many discovery extensions previously granted by the trial court and plaintiffs' failure to complete discovery by the prescribed discovery end date, the "good cause" standard would have little efficacy. Such a result would be a step back to the time when discovery end dates were rarely observed and discovery extensions were routinely granted.

In support of their contention that they established "good cause" under *Rule* 4:24–1(c), plaintiffs rely upon our decision in *Ponden v. Ponden,* 374 *N.J.Super.* 1, 863 *A.*2d 366 (App.Div.2004), *certif. denied,* 183 *N.J.* 212, 871 *A.*2d 90 (2005). In that case, the plaintiff filed a legal malpractice action in February 2001. *Id.* at 6, 863 *A.*2d 366. In August 2002, the trial court ordered the plaintiff to serve her expert report within thirty days and the plaintiff complied with the order. *Ibid.* The court established a discovery end date of October 10, 2002 and, with the consent of the parties, extended that date to December 9, 2002. *Ibid.* The defendant served his expert report on the last date for discovery and then moved for summary judgment, arguing that the plaintiff's expert had rendered "a legally-insufficient, net opinion." *Id.* at 7, 863 *A.*2d 366.

The plaintiff sought additional time to serve a new expert report. *Ibid.* The plaintiff's attorney was new to the case. *Id.* at 6–7, 863 *A.*2d 366. He stated in a certification that a new expert was required due to a conflict of interest. *Id.* at 7, 863 *A.*2d 366. Counsel also stated that, when he obtained the file from prior counsel, it did not contain and he was not aware of the discovery end date. *Ibid.* The trial court denied the application to extend the discovery end date and granted summary judgment to the defendant. *Id.* at 7–8, 863 *A.*2d 366.

We held in *Ponden* that the trial court had mistakenly exercised its discretion, noting that the court had not established an arbitration or trial date. *Id.* at 10–11, 863 *A.*2d 366. In our view, however, plaintiff's reliance upon *Ponden* is misplaced. The facts in this case are distinctly different from those in *Ponden.* The *Ponden* case had been pending for about a year and the time for discovery had only been extended once. *Id.* at 6–8, 863 *A.*2d 366. Moreover, it would appear that, despite the deficiencies in the plaintiff's expert report, the plaintiff had been reasonably diligent in complying with the court's discovery orders. *Ibid.* By contrast, this matter has been pending for a considerable period of time, discovery has been extended several times and plaintiffs

failed to offer convincing reasons for their failure to complete discovery by the prescribed discovery end date.

In seeking reversal of the trial court's orders, plaintiffs also rely upon our decision in *Leitner*. In that case, the complaint was filed on March 3, 2004, and the court established an August 26, 2005 discovery end date. *Leitner, supra,* 392 *N.J.Super.* at 82–83, 919 *A.*2d 899. In June 2005, the plaintiffs' counsel wrote to counsel for the defendant Toms River Regional Schools ("TRRS") and asked for the names and addresses of TRRS's employees who were involved in the dispute so that the plaintiffs could serve them. *Id.* at 83, 919 *A.*2d 899. The plaintiffs' counsel also asked for available dates and times for the depositions of these individuals. *Id.* at 83–84, 919 *A.*2d 899.

Counsel for TRRS refused the request, noting that the plaintiffs' attorney had not provided information as to the correct identities of the individuals in question and never amended the complaint to name the persons allegedly involved. *Id.* at 84, 919 *A.*2d 899. TRRS's attorney also refused to consent to an amendment to the pleadings or an extension of time for discovery. *Ibid.*

The plaintiffs filed a motion to extend discovery, arguing that they had shown "good cause" for the extension. *Ibid.* TRRS opposed the request on the ground that the plaintiffs had not been diligent in pursuing discovery. *Id.* at 85, 919 *A.*2d 899. The trial court denied the plaintiffs' motion and thereafter granted TRRS's motion to dismiss the complaint because persons allegedly involved in the dispute had not been properly identified. *Ibid.*

We reversed, noting that the efforts of the plaintiffs' counsel in discovery "were anemic, vacuous and delusory." *Id.* at 88, 919 *A.*2d 899. We further noted that the prejudice to the individual plaintiffs was "evident." *Id.* at 90, 919 *A.*2d 899. We observed that the case was over 450 days old but an arbitration or trial date had not been set. *Id.* at 92, 919 *A.*2d 899. We additionally observed that defense counsel had never raised any objection to the failure of the plaintiffs to respond to TRRS's discovery re-

quests or seek a case management conference to address discovery issues. *Ibid.*

We also noted that TRRS's counsel had not cooperated in the naming of the individuals who were involved in the dispute. *Ibid.* We further observed that there was nothing to demonstrate that TRRS would be prejudiced by an extension of time for discovery. *Ibid.* We concluded that, under these circumstances, the trial court had mistakenly exercised its discretion by refusing to extend the discovery end date. *Id.* at 93, 919 *A.*2d 899.

In our judgment, plaintiff's reliance upon *Leitner* is misplaced. The facts of this case are significantly different from those in *Leitner.* As we have explained, this case has been pending far longer than the *Leitner* case. Furthermore, in *Leitner,* the court had not extended the time for discovery in the matter, whereas in this case the court granted numerous discovery extensions, ultimately allowing 1,585 days for discovery.

We accordingly conclude that the trial court's decision to deny plaintiffs' motion for a further extension of time for discovery warrants our deference. Plaintiffs failed to establish "good cause" under *Rule* 4:24–1(c). Therefore, the trial court's order does not represent a mistaken exercise of discretion and, because plaintiffs' failed to produce expert reports to support their claims, the court correctly found that defendants were entitled to summary judgment.

Affirmed.